DEBOLT, *Appellant*, v. THE KANSAS CITY, FORT SCOTT & MEMPHIS RAILWAY COMPANY.

*In Banc, June 25, 1894.*

1. **Practice:** APPEAL: AFFIDAVIT. An affidavit for appeal made by the agent of the appellant which states that the appeal prayed for is not made for vexation or delay, but because appellant considers herself aggrieved by the judgment and decision of the court, is substantially sufficient, under section 2248, Revised Statutes, 1889.

2. **Negligence:** ORDINARY CARE. Ordinary care is a relative term, depending upon the character of the work in which the party charged with the duty is engaged and the relation he bears to the person to whom he owes the duty.

3. ———: RAILROAD: LICENSEE. Plaintiff's husband, sent by his employers to superintend the unloading of stone from a flat car, climbed on the car to speak to the men engaged in the work. While they were talking, a switch engine took the stone car and four cars behind it out on the main track, there dropped a car and shunted or "kicked" the others back on the side track. The men on the stone car remained on it while it was moving, except deceased, and another

DeBolt v. The K. C., Ft. S. & M. R'y Co.

who sat on the end board of a coal car next to the stone car and facing the latter. The "kick" was somewhat more violent than usual and the brake on one of the cars "kicked" would not work. As they were about to collide with some cars standing on the side track one of the men on the stone car called to the rest to look out. The companion of deceased threw himself back on the coal car and was not hurt. Deceased, just as the collision occurred, jumped from the coal car to the stone car and losing his balance by reason of the shock fell back between the two cars and was injured and killed. Those on the stone car were not injured. *Held*, that the death resulted from the negligence of deceased in jumping from the coal car to the stone car at the moment of the collision, with full knowledge of all his surroundings, and that the company was not liable therefor. (BARCLAY, J., *dissenting*.)

4. ——: ——: ——: PROXIMATE CAUSE. The fact that the company's servants were guilty of negligence in shunting the cars across a public street without an engine attached to such cars could not avail plaintiff, as the deceased was not in the street and the alleged negligence was not the cause of the death.

5. ——: ——: STATUTE: VARIANCE. In an action founded on Revised Statutes, 1889, section 4425, for the death of plaintiff's husband, caused by the negligence of the servants of a railroad company in running its cars, recovery can not be had on the ground that the injury resulted from a defective brake.

*Appeal from Jasper Circuit Court.*—HON. M. G. MCGREGOR, Judge.

AFFIRMED.

*J. T. James* for appellant.

(1) Usually the question of contributory negligence is one of fact and is left to the jury under suitable instructions. Beach on Contributory Negligence [2 Ed.], sec. 448, page 566; *Smith v. Railroad*, 61 Mo. 588; *Scoville v. Railroad*, 81 Mo. 434; *Reilly v. Railroad*, 94 Mo. 600. (2) When the character of the facts are such that different conclusions may be drawn from them, it is a question for the jury. Beach on Contributory Negligence [2 Ed.], sec. 450 and 451; *Dunn v. Railroad*, 21 Mo. App. 188; *Norton v. Ittiner*, 56 Mo. 351; *Scoville v. Railroad*, 81 Mo. 434; *Roddy v. Railroad*, 104 Mo. 234; *Petty v. Railroad*, 88 Mo. 306; *Lynch v. Railroad*, 112 Mo. 420. (3) The trial court will not

declare as a matter of law one guilty of contributory negligence where the evidence does not make out a clear case of such negligence. *Bluedorn v. Railroad*, 108 Mo. 439. (4) Contributory negligence will be so declared as a matter of law only where no other inference can fairly and reasonably be drawn from the facts in evidence. *Wilkins v. Railroad*, 101 Mo. 93. (5) A railroad company owes a duty of active vigilance to a person lawfully engaged in unloading a car of freight upon a side track where it has been placed by the company or its servants or employees to be unloaded and has no right to back or run a train upon the same track without giving the person so engaged at labor special notice and warning. This is a duty imposed by law upon the railroad company and any person so engaged at labor has a right to rely upon this duty and await that special notice and warning before ceasing to labor and quitting the car to permit it to be removed. Such person may rightly assume that the company will not molest him, nor render his position hazardous without such special notice or warning. *Gessly v. Railroad*, 32 Mo. App. 413; 1 Thompson on Negligence, p. 460. (6) Negligence is not imputable to a person for failing to look out for danger when under the surrounding circumstances he had no reason to suspect any. *Lanyan v. Railroad*, 72 Mo. 392; *O'Connor v. Railroad*, 94 Mo. 150. (7) It is gross negligence for a railroad company to make a flying switch over a public highway which is in constant use without the car being attended by and under the control of a brakeman. It is negligence *per se* to make a flying switch and to kick cars over a street crossing. *O'Connor v. Railroad*, 94 Mo. 150. (8) Defendant is not to be allowed, first, to induce deceased to be careless, and then to plead that carelessness as a defense to an action brought for the injury that has been the result. Beach on Contributory

Negligence [2 Ed.], p. 93, sec. 67; *McGee v. Railroad*, 92 Mo. 208. (9) Unless the acts of the deceased were the direct and proximate cause of the injury, the defendant will be liable. *Kennayde v. Railroad*, 45 Mo. 255.

*Wallace Pratt, C. W. Blair* and *I. P. Dana* for respondent.

(1) The appeal should be dismissed because no such affidavit for appeal was filed as the law requires. *Bridge Co. v. Railroad*, 72 Mo. 664; *Lengle v. Smith*, 48 Mo. 276; *Brown v. Railroad*, 83 Mo. 478; *Clelland v. Shaw*, 51 Mo. 440; Greenleaf on Evidence [15 Ed.], secs. 6 and 489. (2) The trial court did not err in sustaining the demurrer to evidence, because: *First.* There was a failure to prove the essential allegations of the petition. *Current v. Railroad*, 86 Mo. 62; *Jackson v. Hardin*, 83 Mo. 175; *Harty v. Railroad*, 95 Mo. 368; R. S. 1889, sec. 2238; *Nichols v. Larkin*, 79 Mo. 264; *Roddy v. Railroad*, 104 Mo. 234; 3 Wood's Railway Law, sec. 373. *Second.* The evidence did not show that any failure on the part of the defendant in any duty it owed deceased was the cause of his death. *Gurley v. Railroad*, 104 Mo. 223; Patterson's Railway Accident Law, p. 7; *McDermott v. Railroad*, 87 Mo. 285; *Murray v. Railroad*, 101 Mo. 236; *Hudson v. Railroad*, 101 Mo. 13; 2 Wood's Railway Law, sec. 320. *Third.* The evidence showed that deceased's injuries were due to his own carelessness. *Murray v. Railroad*, 101 Mo. 236; *Kellney v. Railroad*, 101 Mo. 67; *Schlereth v. Railroad*, 96 Mo. 509; *Railroad v. Lindley*, 42 Kan. 714; *Henry v. Railroad*, 76 Mo. 288.

GANTT, J.—This action was brought in the circuit court of Jasper county, by the plaintiff, as the widow of Frank DeBolt, to recover of the defendant stat-

utory damages for negligently causing the death of her husband.

The action was commenced within six months after her husband's death, which occurred June 8, 1891. The petition states the following facts as the basis of the recovery sought:

"That on the eighth day of June, 1891, and within six (6) months before the bringing of this suit, her said husband, Franklin A. DeBolt, was engaged in directing the unloading of a flat car loaded with stone, which car was standing on the west switch of defendant's railroad tracks at Webb City, Jasper county Missouri, at the place where defendant's servants and employees had placed it to be unloaded, and on the track where cars to be unloaded are usually placed by defendant at Webb City; and said Franklin A. DeBolt had several men and teams which he was then and there directing in the unloading of said car of stone, and he was busy, engaged in said work, and while he was so engaged, defendant's servants and employees, in making up a train of freight cars, came upon the switch where the car on which said Franklin A. DeBolt was at work as aforesaid, was standing, coupled with other freight cars on said switch while so standing, and all of which cars were not part of a train, but were standing on the switch aforesaid used for unloading cars, and coupled the engine to the car nearest the main track; and there were other cars between the stone car and the engine when the engine was coupled to said cars so standing on the switch, coupled together, and without giving said DeBolt and his men any notice of their intentions to move the stone car, or allowing time to alight from the same, the engine, when so coupled to the cars, under the direction of the conductor and managed and controlled by the engineer, both servants of defendant, pulled the cars from

the switch out on the main track, including the flat car loaded with stone on which said DeBolt was at work, and thereby carried said DeBolt and the men at work on the car under his direction, out on said flat car; and when the cars that were detached from those cars so taken from the switch had been placed on the main track, then a 'flying' switch was made with the stone car and the others yet coupled with it, by which this stone car upon which said DeBolt and the men were all remaining, as they had been taken out from the switches before stated, was with the other cars coupled to it, by the 'flying' switch 'shunted' or 'kicked' in on the switch from the main track with such a force as to drive the cars against other cars that were standing on the switch, and with such force that in striking the standing cars the momentum of the moving cars was so great that the striking, the force knocked said DeBolt from the stone car, under the wheels of the moving stone car, and the force of the moving car was so great that when the wheels had run upon and crushed the legs and person of said Debolt, the brake-beam struck his body and pushed him along on the track of said railroad, over a large stone, for the distance of half a car length, or about sixteen feet, and and so badly injured him that he died from the effects thereof.''

The answer was a general denial, and a plea of contributory negligence.

After hearing the evidence, the circuit court sustained a demurrer thereto. The plaintiff took a nonsuit with leave to move to set the same aside, and in due time filed her motion to set aside, which motion was overruled, and she appeals therefrom.

Objection is made in this court to the sufficiency of the affidavit for appeal. While open to criticism, we think it is substantially sufficient; no point was

made against it in the trial court, and the objection, here, would not justify a dismissal of the appeal.

The substantial question for our determination is the propriety of sustaining the demurrer to the evidence.

The following undisputed facts appear from the evidence: A flat car loaded with stone belonging to William Blackledge & Son had been placed upon a side track of the defendant, at Webb City, for the purpose of being unloaded by the owner of said stone. This car was coupled at the north end to another car loaded with coal, and the coal car was coupled on the north with a box car, to which still another car was coupled. Blackledge & Son were contractors, engaged in building, and plaintiff's husband was in their employment. On the morning plaintiff's husband was killed, other laborers were engaged in unloading the stone from the car, and loading it on wagons, and hauling it away. Several loads had been removed from the north end of the car, next to the coal car, leaving that end clear, when Mr. DeBolt, plaintiff's husband, arrived at the car, between 9 and 10 o'clock that morning. His business there was to superintend the unloading for Messrs. Blackledge. When he reached the car loaded with stone, there were three laborers upon it, Perry, King and Marshall, and he, also, climbed upon it. When he got upon the car, he began to talk with Marshall about placing a derrick to unload the remainder of the stone.

About this time, the employees of the defendant's railroad began to switch in the neighborhood, and Marshall, seeing this, directed one of the teams to drive out of the way. No stone was unloaded after that, before Mr. DeBolt was hurt. It is admitted that it was no part of his duty to assist is unloading the stone. He was there merely to superintend it.

A switch engine was moved up from the south and coupled to the stone car, and this car with those attached to it were all pulled out on the main track in order to set out the fifth car of the group. After passing onto the main track, the fifth car was left on that track, and the other cars, including the stone car, were again moved on the switch or side track and shunted or "kicked" north, in charge of a brakeman, toward the place from which they had been moved. Other freight cars were standing on this side track still further north of the place from which they had been moved. When the switching began, Perry, King, Marshall and DeBolt were all on the stone car, on that part from which the stone had been moved. They all saw and knew of the switching, and all remained on the cars, though at least two stops were made while it was going on. After the switching began, Perry and DeBolt left the stone car and crossed over to the coal car and sat down on the end board, with their faces to the stone car and their feet hanging down between the coal car and the stone car. They sat in this position, discussing a school building during the remainder of the switching until immediately before the accident which cost Mr. DeBolt his life. King and Marshall remained standing on the cleared space on the stone car, and some boys had also climbed upon the stone car.

When the cars were "kicked" back, they were sent with such force that they were carried beyond the point at which they had stood when the switching began, and collided with the other stationary cars on the side or western track. The brakeman in charge set up the brake on the coal car, and attempted to set the one on the box car, but for some reason it would not hold and he called to the men on the stone car to "look out" before the collision. It seems they all anticipated the collision would produce a hard shock.

Perry, who was on the coal car with DeBolt, says, "I looked around and saw they were about to strike together, and threw myself back on the coal car, back on the coal, and *DeBolt jumped off on the stone car, and just about the time he* struck the stone car, the cars ran or bumped together, and he fell backwards between the cars."

Marshall, who was standing on the stone car, hallooed and said, "Look out, gentlemen, some one will be hurt," and just as the cars struck, DeBolt jumped from the coal car, and the shock overbalanced him just as he reached the stone car, and he fell between them. The front wheels of the stone car ran over him and dragged him from twelve to sixteen feet, and he died that day.

No one of the other men and boys on either of the cars was hurt. Those who were standing on the stone car were not thrown down or off the car. None of the cars were derailed or injured. The cars were kicked across Daugherty street, one of the principal streets of the city. When the cars were kicked on the side track, the engine was detached.

Marshall, who was standing on the coal car, attempted to grab DeBolt and prevent his fall, but he says his hand only raked him as he went down. Marshall says all on the stone car saw the engine come down to couple on to it and they staid on to get a ride. He says Mr. DeBolt could have superintended the unloading as well by standing on the ground as by getting on the car. The top of the stone car would strike somewhere about the breast of Mr. DeBolt.

I. There is a total failure of proof of the allegations in the petition that plaintiff's husband was busily at work moving the stone and had no warning that the company was about to switch the cars. It is perfectly clear that Mr. Debolt and the laborers engaged in

unloading the stone, all saw the engine attached to the stone car.

It was broad open daylight, and the very fact of coupling the switch engine to that car was notice and warning that it was to be removed. Moreover, it was apparent from the further fact that Marshall, one of the men, ordered the team that was to receive the stone, to move away, in view of the switching that was about to take place.

There was ample time, while the coupling was going on, for all of these men to alight from the car, if they desired to do so, and it was evident that they could make no further progress in unloading until the switching ended. The conclusion is inevitable that deceased and all the others voluntarily remained on the cars.

The case is wholly wanting in these features made prominent in the petition, to wit, that of a workman busily intent upon his work of unloading, suddenly, and without warning, violently thrown against stationary cars and hurled from his car by the shock.

On the contrary, the facts are, no work of unloading was going on, and the intention to move the car in the switching was a patent, obvious fact to all concerned, and it is not true that Mr. DeBolt was thrown from the car on which his employer's stone was. He had voluntarily left that car, and gone upon a coal car without permission, and, so far as the evidence discloses, without notice to the servants of the company who were doing the switching. So that, it seems plain that the specific negligence charged is disproved by plaintiff's own evidence. But, assuming that there is enough left in the general charge of negligence to justify a submission, would the facts shown have justified the court in submitting the case to the jury?

The point made by counsel in this court that it was negligence to "kick" the cars across Daugherty street without having an engine attached, can not avail plaintiff, because her husband was not on the streeet, and there is not the remotest connection between this supposed negligent act by defendant, and the death of plaintiff's husband. His death resulted from his fall between the cars, and the crossing of the street by defendant's cars was in no sense the proximate or other cause of his fall. The result would have been the same if the cars had not crossed this street.

Neither can a recovery be had on the defective brake. Plaintiff's action is not bottomed on defective machinery but upon the negligent running of the cars under section 4425, Revised Statutes, 1889. The rule invoked by plaintiff that the railroad company owes to those lawfully on its tracks, unloading its cars, active vigilance, in protecting them from injury, does not apply to the facts of this case, for the simple reason that Mr. DeBolt and those with him were not so engaged when he was hurt.

The rule is predicated upon the theory that persons engaged in unloading cars may properly become so engrossed in their labor that they may become oblivious to the dangers around them, and, having placed themselves in such a situation, with the knowledge of the company, it would be negligence in the company to move its cars without warning them. The death of plaintiff's husband did not result from the movement of the car while he was engaged in unloading it, but after it had been moved, and after full notice to him and while he was riding upon the cars that were being switched. There can be no doubt that deceased had sufficient warning that this car would be moved and ample time and opportunity to have alighted from it, if he had desired to do so. He voluntarily remained on the car.

The duty defendant owed him was to exercise ordinary care in switching its cars about its tracks. Ordinary care is a relative term, depending upon the character of the business in which the party charged with the duty is engaged, and the relation he bore to the person to whom he owes the duty.

DeBolt was not a passenger. This was not a train for carrying passengers. It was not a train in any sense, either freight or passenger. The work in hand was simply switching certain freight cars on a side track in order to get out one for its main track. The most indifferent intellect could grasp the nature of the work. Plaintiff's husband could not have been mistaken as to the nature of the work. The defendant was simply engaged in arranging its cars in its ordinary business, the character and method of which must have been familiar to deceased. He must have known that there is always more or less jolting in the coupling and placing of freight cars on the different tracks. Ordinary care, then, simply required the switchmen of defendant to do their work in the usual manner and with the promptness and care which the interest of their employer demanded, and, by this test, we have read the record carefully, and have not been able to find in what respect the switchmen were wanting in that care which deceased had a right to demand.

It is in evidence that the cars were sent back against the standing cars "more rapidly than usual," "a little peart," "at a pretty good rate;" but the speed can best be tested by the physical facts themselves. There were both men and boys standing upon the stone car and this collision did not throw any of them off the car or off their feet, and one of them, Marshall, so far retained his balance and presence of mind as to enable him to endeavor to save Mr. DeBolt from falling. Perry, who sat by deceased on the coal car, was not

thrown from his seat by the collision, and was not injured.

These cars only ran from twelve to twenty-five feet, less than one car length. None of them were derailed or injured. Had deceased remained either on the stone car or sat still on the coal car where he was, he would not have been injured. In the exercise of care, the switchmen and brakemen were not bound to anticipate that any of these laborers would imperil their safety by jumping from one car to another while they were in motion, and particularly just as a collision of the cars was imminent. We think it is apparent, from all the evidence, that this deplorable accident and misfortune was the result of the attempt of Mr. DeBolt to jump from the coal car to the stone car just at the moment of the collision and that his conduct in so doing was not superinduced by any want of care by defendant's employees.

The ordinary warnings of "look out" were not calculated to cause a reasonable man to attempt the rash act, which caused his death.

We think the circuit court correctly held that this evidence would not sustain the verdict. The judgment is affirmed. BLACK, C. J., BRACE, BURGESS, MACFARLANE and SHERWOOD, JJ., concur. BARCLAY, J., dissents, for the reasons stated in his opinion in division one, which he now refiles as expressing his views.

### DIVISION ONE.

BARCLAY, J. This action was brought by the plaintiff as the widow of Mr. F. A. DeBolt to recover statutory damages ($5,000) for her husband's death, alleged to have been caused by the negligence of defendant.

During a trial on the circuit, the court instructed the jury that, upon the plaintiff's evidence, she was

not entitled to recover, and that a verdict should therefore be rendered in favor of defendant. Whereupon plaintiff took a nonsuit with leave, etc.; and, after an unsuccessful motion to set the same aside, and preserving the necessary exceptions, she appealed.

Her case presents the following facts:

Mr. DeBolt, plaintiff's husband, was a stone-mason and brick-layer. He was foreman for Blackledge & Sons, contractors and builders, at Webb City, who directed him to oversee the unloading of a car of stone, then standing on one of defendant's side tracks near the station in that city. The car had been placed there by defendant at the request of Mr. Blackledge to be discharged of the shipment of stone upon it, intended for that firm. Three workmen were on the car unloading the stone. Three or four wagon loads of it had been taken off the north end of the car before Mr. DeBolt appeared, which was between 9 and 10 o'clock A. M., June 8, 1891. He got upon the stone car and began talking with one of the workmen about the business in hand; but no stone was unloaded, after he arrived, before he was hurt.

It was not his personal work to unload, but to superintend the unloading.

There were cars on both sides of the stone car on the side track. Coupled to its north end was a car loaded with coal. The car next north of that was a box car.

While these men were standing on the northern part of the stone car (from which part, the stone had been already removed), talking about the placing of a derrick to unload the remaining large stones, a locomotive (which had been switching cars near by, making up a train) moved down the side track, pushing two or three cars, which were made fast to the stone car when they reached it.

The engine then ran southward, pulling out five of the cars standing on that track, one of them being the stone car (which was about the middle of the group) and another, the coal car. The object was to set out on the main track the fifth car.

These cars were pulled south beyond the switch leading to the main track. The switch was then changed and the fifth car pushed north upon the main track and left on that track; after which, the remaining cars were again moved south on the main track and stopped, while the switch was shifted to connect with the side track, as at first, and the remaining cars (including the stone and coal cars) were then pushed, or "kicked," north on the side track, in charge of a brakeman, toward the place from which they had been taken.

Before they were stopped, however, they struck with considerable force some other cars that had been left standing on that track. To this collision DeBolt's death is ascribed.

The men (including DeBolt) on the stone car saw the engine move up the side track and couple to the cars, but nothing was said to them by the railroad employees about getting off, so they remained on the car. As the engine was backing up, to be coupled to these cars, a wagon and team, belonging to the working party under direction of DeBolt, drove up to take a load of stone from the car, but one of the workmen (Marshall) directed the driver to "drive out," which he did.

As the cars were being pulled south along the side track, DeDolt and one of the workmen (Perry) stepped over to the loaded coal car, and sat on the end of it next to the stone car and facing the latter. They remained there while the cars were being switched. The other men stood meantime on the stone car.

The coal car had end and side boards, from two to three feet high, to hold the coal on.

DeBolt and Perry sat on the south end board with their feet hanging over on the south side. DeBolt was near the side of the car, and on Perry's left.

DeBolt and Perry continued sitting there, while the cars were being switched.

Just as the moving cars approached those which had been left standing on the side track, all the men noticed that the moving cars were likely to strike the others with unusual force, and they gave various sudden exclamations indicating that fact.

What followed, Perry narrates thus:

"So I looked around, and found they were about to strike together, and threw myself back upon the car —threw myself backwards right upon the coal, and DeBolt jumped off on the stone car; and just about the time he struck the stone car, the cars ran together, or bumped together, and he fell right over backward between the cars."

Another eye witness said: "Marshall hallooed out and says, 'Look out, gentlemen, some one will be hurt,' and Mr. DeBolt, just as the cars struck, jumped from the coal car on the end of the stone car and was overbalanced; and it knocked him down between the cars; the bump did."

He was run over by the front wheels of the stone car and received injuries from which he died the same day.

Perry, who threw himself back into the coal car, was not damaged beyond being shaken up "pretty lively," as he describes it.

None of the persons on the stone car was injured.

As to the speed with which the cars were moved back on the side track, Perry said, "they ran together with a terrible force."

Other witnesses described it in various ways, thus: "They were passing pretty fast;" "they were coming down tolerable peart;" they were moving a little more rapidly than common;" "it seemed to me they were putting them in with quite a rush."

The brakeman, who was with the group of cars as they ran north on the side track, testified that he noticed DeBolt sitting down while they were switching; that he shouted to him and the others to "look out," just before the cars collided, and that DeBolt stood up and was trying to step from one car to another when they struck and he fell between two of them.

The brakeman also said that the brake on one of the box cars was poor and it would not hold; that he set the brake on the coal car on which DeBolt was riding, which he thought held.

There was nothing to show what was the matter with the brake on the box car, or how long it had been in bad condition, or that anyone knew about it before the brakeman tried to set it.

Just before the collision, the brakeman ran down the ladder on the box car, next to the coal car, and jumped off.

It also appeared, from marks on the ground, that the body of deceased had been dragged from twelve to sixteen feet between the rails.

When the cars came together, at the time DeBolt was knocked off, the group of cars on which he was riding was not attached to the engine. The latter had been uncoupled after having started the cars northward, and they ran by their own momentum till they hit the standing cars on the same track.

A short distance south of the point of the accident, and at right angles to the railway, Daugherty street ran. It was a frequented road, being the principal thoroughfare between Webb City and Carterville.

The relation of plaintiff to the deceased was shown.

The above statement presents the principal points of plaintiff's testimony, though some further facts may perhaps be referred to later on.

1.   Before examining the merits of the case there is a preliminary question for decision, raised by defendant's motion to dismiss plaintiff's appeal on the ground that no sufficient affidavit therefor was filed as required by law.   There is an affidavit on file, but it is questioned for supposed noncompliance with the statute.

In order that the nature of the objection may be readily understood, we insert the exact language of the affidavit (omitting formal parts) by the side of the statutory provisions governing, viz:

| THE AFFIDAVIT. | THE STATUTE. |
|---|---|
| "J. T. James, being duly sworn, says that he is the agent for the plaintiff, Sophia C. DeBolt in the above entitled cause.   That the appeal prayed for in this cause is not made for vexation or delay, but because the plaintiff considers herself aggrieved by the judgment and decision of the court.<br>          "J. T. JAMES."<br>"Subscribed and sworn to," etc. | Sec. 2248.   *   *   *   "The appellant or his agent shall, during the same term, file in the court his affidavit, stating that such appeal is not made for vexation or delay, but because the affiant believes that the appellant is aggrieved by the judgment or decision of the court."<br>          (R. S., 1889). |

The precise defect in the affidavit is said to be its failure to declare that *the affiant believed* the appellant aggrieved by the judgment.   Instead of so stating, the affiant says that the   plaintiff   "considers   herself aggrieved," etc.

Defendant insists that this departure from the statutory language is fatal to the appeal and precludes a hearing on the merits.

In *Myers v. Woolfolk* (1834), 3 Mo. 348, an affidavit which recited "that he did not appeal, but because

VOL. 123—33

he was aggrieved by the judgment of the justice," was held sufficient.

In *Manion v. State* (1848), 11 Mo. 578, an affidavit wherein the word "injured" appeared, instead of "aggrieved," was pronounced good.

In *Burton v. Collin* (1834), 3 Mo. 315, and in *Melcher v. Scruggs* (1880), 72 Mo. 406, it was ruled that the agency of affiant for appellant might be established by facts outside the affidavit itself.

These prior rulings indicate that a substantial compliance with the statute is all that is required; and that other parts of the record, at least, may be looked at, if necessary, to support the affidavit and to eke out the statutory requirements.

In the case at bar the affiant was the attorney of record of the plaintiff throughout, and had filed her motion for new trial complaining of the ruling of the court in forcing plaintiff to take a nonsuit. That motion had been overruled and she had duly excepted.

That plaintiff was ag r ved or injured by the decision of the court is very plain to be seen from the record. But the affiant, acting as her agent or attorney, thought fit to recite that the plaintiff considered herself aggrieved, instead of deposing that he believed her aggrieved. He undoubtedly supposed that her belief was the fact to be shown.

She was, however, the appellant, the "person aggrieved," described in the statute (sec. 2246), asking the appeal, as affiant declared.

He swore that the appeal was not made for vexation or delay. That fact, taken in connection with the statute last cited, and the record, warrants the inference that the affiant believed the appellant aggrieved by the judgment, though he adopted a very roundabout way of saying so.

The plaintiff's affidavit to the effect stated in his would be unquestionable.

The most material part of the affidavit (as to the good faith of the appeal) meets the very letter of the statute; and the circuit judge allowed the appeal.

In view of this condition of the record, we hold the affidavit to be a substantial compliance with the requirements of law, and accordingly overrule the defendant's motion to dismiss the appeal.

2.   The trial court declared that the plaintiff was not entitled to recover under the evidence. The plaintiff assigns that ruling as error.

There are two issues arising on the merits, which will be considered separately.

*a.*   Was defendant negligent?

In examining the correctness of the ruling denying plaintiff any right of recovery, she is entitled to the benefit of the most favorable view of the case that the facts will permit, and of every reasonable inference they will warrant.

Defendant was chargeable with the exercise of, at least, ordinary care towards the deceased, who was lawfully upon its cars for the purpose of unloading the stone.   (*Spotts v. Railroad* (1892), 111 Mo. 380).

The railway operatives can, in no just view, be regarded as fellow servants with the deceased, who was employed by the consignees of the freight to be delivered.

These propositions are clearly too self-evident to require more than this bare statement for their support.

But it is insisted that, as the deceased left the flat car (on which was the stone), while it was being moved south, and took a seat on the end board of the coal car, he thus became a trespasser, and that "defendant owed him no duty, save to refrain from wantonly injuring him," as defendant's counsel assert.

The coal car afforded a better place to ride (while the switching movements were being made) than the flat car, on which, it seems, the men who remained were obliged to stand.

The flat car had no sideboards or other guards to prevent one from falling off.

Nothing could be done in the matter of unloading while the cars were in motion.

The deceased was on the cars by the express authority of defendant. He was in plain view of the employees in charge of the train. He surely did not become, in any sense, a trespasser by taking an apparently safer, and certainly a more comfortable, position for the short ride that the switching involved.

His conduct in this particular has a more important bearing on the issue of his negligence, hereafter discussed; but, in my judgment, it does not furnish foundation for a declaration of law that defendant was absolved from the duty of observing ordinary care to avoid injuring him, while lawfully upon its train, so near the car on which his unfinished work was to be done.

As a part of plaintiff's case, it appeared that one of the brakes on a car in the group with the stone car was not in good order. The plaintiff does not base her claim for damages upon the defect in the brake; but on negligently "running," etc., the locomotive and cars, under section 4425 (R. S. 1889).

The condition of the brake is mentioned in the petition as a fact; and it was also admissible in evidence as part of the *res gestæ*. But plaintiff's recovery does not depend upon the exhibition of a state of facts which would be necessary if her case rested on allegations of defective machinery. It is negligence in running or operating the train which constitutes the groundwork of her claim.

The question of negligence should always be considered with a due regard to all the circumstances shown in the particular case.

Here the train operatives saw, or (what is the same thing for present purposes) a jury would be warranted in inferring, from the facts already stated, that those operatives saw, the deceased and other men of his working party on the open cars when the switching began, and during its progress. If they intended to move the cars in a manner which would, or might be, unsafe or dangerous to those persons, some notice or warning to get off should have been given to them.

They were actually engaged in receiving freight from defendant as a common carrier during business hours.

So long as they were there on such business, it was the plain duty of defendant not to so move or shift the cars as to jeopardize their safety without some warning of such a purpose.

The "physical facts" (which are elsewhere referred to), no less than all the other testimony before the court, tend to show that these cars were run back upon the side track with an utter disregard of that duty.

When they struck the standing cars on the same track, the latter cars were knocked northward, and the flat car laden with building stones (heavy enough to require a derrick to shift them) ran twenty or twenty-five feet further, notwithstanding the obstruction afforded by the cars with which they collided, and notwithstanding the resistance of the body of the deceased, which, after he fell, was caught between the brakebeam and a large stone (which some of the witnesses call a "boulder") in such a way that the stone cut a furrow fourteen or sixteen feet long from north to south between the rails, before the car wheels caught him.

These are "physical facts." They fully corroborate the statement of the witness Perry, that the cars ran together "with a terrible force."

The exclamations of the bystanders, as they saw the cars in motion, just before the collision (admitted in evidence without objection), reveal the common opinion of them all as to the occurrence.

One said, as the cars went by, "Watch down yonder and see them smash something;" another, "Look out, there will be somebody hurt there;" while those on the cars uttered various similar warnings, which will be mentioned more particularly further on.

It seems that some suppose that no inference of defendant's negligence arises from these facts, because no other person upon the cars, besides DeBolt, was thrown from his feet by the collision. Perry was not, for he threw himself backward upon the coal car where he was sitting; and thus, as he says, escaped. Marshall, who was on the flat car, testified that he began to feel it was necessary to steady himself to hold on; that he said to the men, they were in considerable danger of being hurt, and "threw himself over on the car;" and when the collision occurred (to quote his own words) "came pretty near falling over, head first, the same as the other men did." He tried to catch DeBolt as the latter fell between the cars, but did not succeed. As he describes it, he only "raked him on the side as he went down."

These incidents of the scene do not appear to me to remove the inference of negligence, but rather to strengthen it.

Various other descriptions of the effect of the meeting of the cars are given in the testimony.

"It jarred us up pretty well," said Perry. "I would call it a pretty severe jolt," testified Wildman.

These remarks do not, in my judgment, appear to

indicate the use of any reasonable amount of care toward the persons on the cars, any more than do the physical facts.

The making up of freight trains is, no doubt, often necessarily accompanied with sharp jolts and jars; but these men, who were upon the cars for the sole purpose of unloading the cargo, had no reason whatever to anticipate that they would be subjected to the risks attending the making up of a freight train.

They were entitled to a reasonable time to unload the stone, and to ordinary care from the defendant while doing so.

When defendant took out the car on which they were at work, DeBolt had no ground to suppose that it was to be thrown back violently against the other cars on the side track, as was afterwards done.

What would be ordinary care on the part of the defendant in handling its freight cars for its own purposes, and toward those engaged by it for such a business, is not necessarily the care which would be expected of it, by law, toward persons rightfully on its cars, as was the deceased, for the transaction of business.

The true issue now before us is, what was reasonable and proper care in managing these cars, in view of the presence of DeBolt and his workmen upon them.

Whether any higher degree of care than ordinary, could be lawfully required of defendant, it is not essential to decide; for, in my judgment, the action of defendant can not be shown to be consistent with even ordinary care.

We are not now finally trying the question of negligence. The limit of our present duty on this branch of the case, is to declare whether or not the evidence tends to prove negligence on defendant's part, or would reasonably warrant an inference of its

negligence by fair minded men. In my opinion it does.

That conclusion seems too obvious, from a mere statement of the facts, to require further discussion.

*b.*    As to the negligence of the deceased.

The rule on this point, relative to the respective functions of judge and jury, is that the court is not warranted in pronouncing that certain facts establish negligence, as a matter of law, unless no other conclusion is fairly deducible from them, giving the plaintiff the benefit of every favorable inference which the facts reasonably allow. This is a very familiar proposition in our practice.

The facts, already mentioned bearing on the issue now before us, need not be repeated. But one phase of them may justify a few further remarks.

At the moment when the collision was impending, the deceased sprang from his place on the coal car to the flat car. But just as he reached the latter, the collision occurred, and the jolt threw him backward between the cars.

One of the witnesses (Perry) describes this thus: "Just about the time his feet struck the platform of the car, they ran together with terrible force and threw him off his balance and he fell down between."

Before, and at the time, DeBolt made this move, outcries were uttered by the men on the cars, including him, expressing their sense of impending danger.

He said to one of them, "You had better look out," or "Attend to the brake," or something similar.

About that moment, the man addressed cried out, "Look out! they are going to strike hard;" or "Look out! Some of us will get hurt!"

Just before DeBolt stepped upon the flat car, the brakeman on the box car shouted to him and the others to "Look out," and then ran half way down the ladder, on the side of the car, and sprang to the ground.

Perry, the man sitting by the side of DeBolt on the coal car, threw himself upon his back on the coal car at that moment.

The northern part of the flat car had been cleared, and was the most natural place for DeBolt to attempt to reach, on getting upon his feet.

In obedience to a natural impulse of self preservation he arose upon the appearance of danger, and tried to escape from it. The brakeman's jumping from the train and the exclamations and acts of those around him were calculated to inspire DeBolt with a sense of immediate peril.

He acted on the impulse of the moment and reached the flat car safely.

He would not have been injured, but for the collision which, at that instant, occurred and threw him between the cars to his death.

These are inferences which the facts reasonably suggest, in my judgment.

His entire conduct is entitled to, and should receive, due consideration by the triers of fact, in determining whether he took ordinary care for his own safety in the premises. But the fact that he sprang to the coal car, when he saw the collision imminent, does not, in my opinion, stamp his action as negligent in law. Whether it was negligent in fact was for the jury.

In *Kleiber v. People's R'y Co.* (1891), 107 Mo. 240, it was held that if one, by the negligence of another, has been placed in a situation of apparently imminent peril, he is not required, in attempting to escape therefrom, to exhibit the same prudence which might reasonably be required of him in the absence of such a peril. MACFARLANE, J., speaking for the court in *banc*, said: "If, without having time to deliberate, and acting upon the instinct of self preservation, and as a prudent person might be expected to act in the circum-

stances, he is injured by adopting a dangerous alternative, he may still recover from the one by whose negligence he has been impelled to act" (p. 247).

That rule is but an application to special facts of the general principle running through the law of negligence, namely, that the measure of care in each case, must be adjusted with reference to its peculiar circumstances.

All that can justly be demanded by the law of one in a position of great danger is such a degree of care as might reasonably be expected of a person of ordinary prudence in like situation.

No extended comment on the evidence touching this branch of the case could make it more clear.

It seems to me quite evident that, on the facts exhibited by the present record, the question whether or not the deceased acted with reasonable prudence and care to avoid danger was one for the jury, and should have been put before them by the trial court under suitable instructions.

3. Defendant next contends that, whatever be the view of the court as to the probative force of plaintiff's facts, they do not support the allegations of her petition.

The latter furnishes an unnecessarily particular account of the transaction, and charges that the deceased was on the flat car during the switching.

In point of fact, he was not, as has already been shown. But it is alleged that he was knocked from the stone car under its wheels by the movement of that car and others against those standing on the switch; that deceased was lawfully on the car engaged in his work (already described), and was so badly injured that he died, "by the neglect, carelessness," etc., of the officers, agents, etc., of defendant, "whilst running, conducting and managing the cars before mentioned."

A general charge of negligence is sufficient as against objections made at the trial. For, under our code, the allegations of a pleading should be liberally construed in determining its effect. R. S. 1889, secs. 2074, 2117.

It is not necessary for plaintiff to prove every fact alleged in her petition, but only enough of them to constitute a cause of action. This, it seems to me, she did.

4. The last point is that a map or diagram of the place of accident was introduced in evidence, but has not been preserved by bill of exceptions, and is not now before this court. From that fact it is argued that "all doubts are resolved in favor of the trial court." Inferentially probably it is meant to be asserted that the judgment should be affirmed because the diagram is not in the record on this appeal.

The evidence of the various witnesses who refer to the map establishes the position of all the landmarks in the vicinity, their bearings, the distances between them, and the location of defendant's tracks so clearly that it would be easy to reproduce the diagram were it necessary. But the facts which tend to make out a *prima facie* case for plaintiff are of a kind which no diagram of the place could negative.

Even if contradicted by the testimony of the witnesses on the points to which it referred, it would be for the jury to respond as to which they would credit.

Probably more attention has been given to this point than it requires.

5. The conclusion that would follow from the foregoing is that the judgment should be reversed and the cause remanded for a new trial. But it is a matter of regret to me that my learned associates (BLACK, C. J., and BRACE and MACFARLANE, JJ.,) do not agree to that

result.   They are of opinion that the facts do not tend to establish a case for the plaintiff to be submitted to a jury.   They accordingly vote for an affirmance of the judgment of nonsuit.   My dissent is respectfully entered to that judgment; and all the judges then agree to transfer the case to the court *in banc*.

6. It should be added, however, that all the judges of this division concur in the first paragraph of the above opinion, denying the motion to dismiss the appeal.