## RUELL W. JACKSON v. SOUTHERN BELL TELEPHONE COMPANY, Appellant.

Division One, March 2, 1920.

1. **AUTOMOBILE: Driver's Degree of Care: Contributory Negligence.** A driver of an automobile on a public highway is required to use "the highest degree of care that a very careful person would use under like or similar circumstances," and the statute establishes a general rule for all drivers, not only to protect the lives and property of others, but also to protect themselves and others traveling with them from injury by collision with obstructions in the road, whether legally or unlawfully placed there. Any less degree of care by the driver is contributory negligence, and bars a recovery by him for personal injury from the telephone company which had placed the obstruction in the road.

2. ————: **Care Defined.** Ordinary care is such care as would ordinarily be exercised by an ordinarily careful person under the same or similar circumstances. But the statute requires the driver of an automobile on a public highway to exercise "the highest degree" of care that a "very careful person" would use under like or similar circumstances; and those words mean the highest care and caution of an experienced and competent chauffeur, since an automobile is an exceedingly dangerous machine unless kept under control. They do not mean the highest conceivable degree of prudence and skill possible to man, but the highest degree that has been demonstrated to be practicable.

3. ————: **Contributory Negligence: Question for Jury.** Under the Automobile Statute of 1911, if reasonable men may honestly differ as to whether the driver of the automobile, the circumstances considered, exercised the highest degree of care of a very careful person, the question of his contributory negligence is for the jury to settle; but if his failure to exercise such care is apparent to all reasonable men from the undisputed facts in evidence, then it becomes the duty of the court to declare, as a matter of law, that his contributory negligence bars a recovery; and in this case it is held that plaintiff's own undisputed testimony unquestionably shows that he was not exercising the highest degree of care of a very careful person, and therefore a demurrer should have been sustained.

4. ————: **To Right of Center of Road.** The statute (Par. 9, sec. 8, Laws 1911, p. 327) requires the driver of an automobile to turn

Jackson v. South. Bell Tel. Co.

to the right of the center in approaching a turn in the public
highway only when he meets another person riding or driving a
horse or another motor vehicle; if there is no other person or ve-
hicle on the road, he has the right to use the center, and even the
left side.

5. ———: Skidding: Knowledge of Driver. Where the driver of the
automobile left the smooth and beaten center of the public road,
when there was no necessity for doing so, and encountered clods
which caused his car to skid and strike a guy telephone pole, his
contributory negligence cannot be excused by a failure of the evi-
dence to show that he did not know that automobiles would skid
in turning on to rough ground and clods. A very careful person,
exercising the highest degree of care, venturing to drive an auto-
mobile at a turn in the public highway, at a speed of twelve or
fifteen miles an hour and with the power off, thirty or forty feet
over dry clods and rough ground, in daylight, his view unobstruct-
ed, would, before doing so, at least inform himself as to the
common conditions and places in the roads which cause such ve-
hicles to skid.

Appeal from Buchanan Circuit Court.—*Hon. Thomas B.
Allen,* Judge.

REVERSED.

*W. B. Norris, D. E. Palmer* and *Battle McCardle*
for appellant; *D. A. Frank* and *J. W. Gleed,* of counsel.

(1) The location of the pole in question did not
constitute negligence on the part of the defendant, and
the accident complained of was caused by plaintiff's
own fault and negligence, and was not due to any fault
or neglect on the part of the defendant; and it was
error for the court to refuse defendant's demurrer to
plaintiff's evidence and defendant's request for peremp-
tory instruction at the close of all the evidence. Sec.
3326, R. S. 1909.; Julia Building Assn. v. Bell Tele-
phone Company, 88 Mo. 258; McCann v. Telephone
Company, 69 Kan. 210; Elliott on Roads & Streets
(2 Ed.), par. 621; Nelson v. City of Spokane, 45 Wash.
31; Atchison v. City of St. Joseph, 133 Mo. App. 563-
566; Seibert v. Railroad Company, 188 Mo. 657; Eber-
hardt v. Telephone Company, 91 Kan. 763; Par. 9, sec.

12, Laws 1911, p. 330; Massie v. Barker, 113 N. E. 199; Baldwin v. Maggard, 162 Ky. 424; O'Dowd v. Needham, 13 Ga. App. 220; Wheat v. St. Louis, 179 Mo. 572. (2) Instruction No. 1, given on behalf of plaintiff stated incorrectly the degree of care required of plaintiff while driving an automobile upon the highway. Par. 9, sec. 12, Laws 1911, p. 330; Mitchell v. Brown, 190 S. W. 354; Meenach v. Crawford, 187 S. W. 879; Floweree v. Thornberry, 183 S. W. 359; Ex parte Kneedler, 243 Mo. 632; Baldwin v. Maggard, 162 Ky. 424; O'Dowd v. Needham, 13 Ga. App. 220; Massie v. Barker, 113 N. E. 199. (3) Said instruction ignored the issue made by the petition that the pole obstructed, narrowed, and made unsafe the highway, and directed a verdict for plaintiff if it found only that plaintiff was incommoded by the manner in which the pole was set. It ignored the issue of negligence. Gay v. Mutual Union Tel. Co., 12 Mo. App. 485; Julia Building Assn. Co. v. Tel. Co., 88 Mo. 258; Seibert v. Railroad, 188 Mo. 657; Atchison v. City of St. Joseph, 133 Mo. App. 563; Hook v. Bowden, 144 Mo. App. 330; Reedy v. Brew. Assn., 161 Mo. 523; Reno v. St. Joseph, 169 Mo. 543; Perrigo v. St. Louis, 185 Mo. 274.

*L. C. Gabbert* for respondent.

(1) The pole or guy stub in question was admitted to be nine feet in the public highway. The overwhelming evidence is to the effect that this pole narrowed the highway and was frequently run into and against by automobiles other than the plaintiff's. Placing the pole in the highway nine feet from its north boundary incommoded the public. At least the jury so found upon the overwhelming testimony to that effect. This, therefore, made the defendant a trespasser, a violator of the law and in no position to complain that the act did not constitute negligence. "An obstruction that appears to interfere with the public's rights, or to endanger the safety of travelers, or annoy those coming in contract with it at a place on the right-of-way of a public

road is an obstruction thereof, and indictable as a nuisance at common law if not under the statute." State v. Campbell, 80 Mo. App. 110; R. S. 1909, secs. 3326, 10533; Wright v. City of Doniphan, 169 Mo. 601. The proof was ample, full, complete and uncontradicted that the pole was not only nine feet within the highway, but was set in a position at the turn of the road so that persons approaching from the south could not ascertain that the pole was out in the highway until one was making or had made the turn. Numerous persons traveling upon this highway had found this to be true to their sorrow. Furthermore, plaintiff's car was at all times in the traveled roadway, which was "right up to the pole." Tetherow v. St. Jos. & Des Moines Ry., 98 Mo. 74. There is no question in this case that the act of defendant in placing the pole in the traveled roadway was the actionable proximate cause of the injury. Hull v. City of Kansas, 54 Mo. 598; Ballentine v. Kansas City, 126 Mo. App. 130; Bassett v. City of St. Joseph, 53 Mo. 290; Vogelgesang v. City of St. Louis, 139 Mo. 127; Harrison v. K. C. Electric Light Co., 195 Mo. 623; Benjamin v. Met. Street Railway Co., 133 Mo. 274; Buckner v. Horse & Mule Co., 221 Mo. 710. (2) Instruction No. 1 on behalf of plaintiff correctly stated the degree of care required of plaintiff. The rule requiring a person operating an automobile on public roads to use "the highest degree of care that a very careful person would use, under like or similar circumstances," cannot avail the defendant in this case. The defendant is not suing for injury to its property. Defendant had imposed an unlawful obstruction in the highway. It therefore cannot seek to absolve itself from damages for its wrongful or unlawful act because the statute enjoined upon plaintiff the highest degree of care toward persons properly using such highway. No other person, than plaintiff and his family, were "on or traveling over the highway." Neither plaintiff, nor any other person, could observe, on account of the deceptive perspective, that there was a pole in the road. What reason for plaintiff to be nerved to the high

tension required in a crowded highway? The statute required no such degree of care. Plaintiff is only obligated under the statute to the use of such high degree of care in order "to prevent injury or death to persons on, or traveling over, upon or across such public roads, streets, avenues, alleys, highways or places much used for travel." Laws 1911, p. 330. The degree of care required of plaintiff in order for plaintiff not to be guilty of contributory negligence has always been the degree of care that an ordinarily prudent person would use under like or similar circumstances. Floweree v. Thornberry, 183 S. W. 359; Smith v. Union Ry. Co., 61 Mo. 588; Myers v. C., R. I. & P. Ry. Co., 103 Mo. App. 268.

SMALL, C.—Appeal from the Circuit Court of Buchanan County. Plaintiff sued defendant for personal injuries sustained by him while driving a Ford automobile which, in making a turn in the road to the west, skidded against a telephone pole of defendant near the north edge of the road. It was in the country near Saxton, Buchanan County. The verdict and judgment were for plaintiff in the sum of ten thousand dollars. Defendant duly appealed to this court.

Plaintiff testified on direct-examination: That he lived near Easton, east of Saxton, Missouri. That on the morning of the 25th of February, 1917, he started in his Ford automobile to go to St. Joseph. He had had the car twenty-three days. It was his first car. He had driven every day except one. Had driven a Ford car, but not very much, before he bought this car. On this morning, he was driving, and his wife and three children were with him in the car. He had to make a turn to the west in the road, about two miles east of Saxton. As he approached this turn he was going north. The road going north, from fence to fence, was about forty-five or fifty feet wide, and about the same running west. There was a concrete culvert running diagonally from the southwest to the northeast corners of the turn in the road. There was a line of telephone poles running

along the south side of the east-and-west road, and the west side of the north-and-south road. There was also a guy telephone pole on the north side of the east-and-west road about eight or nine feet south of the fence. The concrete culvert was thirty-eight feet long. There were ditches leading into it from the west on the north and south sides of the road. This guy telephone pole was twenty feet north of the edge of the ditch on the south side of the road. The ditch at this point was something like five or six feet deep. On the north side opposite, the ditch was not over a foot or two deep right by the pole. The ditch was four or five feet wide. The ditches got deeper as they went east towards the ends of the culvert. The road was higher in the center than at the sides, so that the water would run off. On the day in question, the road was dry, and outside of a few clods, it was smooth. The clods were little and round—not very big—on the side of the road. There was a little grass right down by the pole, between it and the center of the road. The road was pretty good right in the center. As plaintiff came north up to the turn he turned to his left to start west. Previous to making the turn, he had not noticed this telephone guy pole setting out in the roadway, until just before he hit it. He never paid any attention before that to the telephone poles along the road. Coming up from the south you could not tell that this pole was out there "to save your neck" until you turned the corner. It looked like it was right in line with the others coming south. He got the car turned and it kept skidding along on some clods, and he could not get the wheels to take (hold) when they ought to, and the first thing he knew, the right front wheel struck the (guy) telephone pole and tipped the car over and threw them out. It bursted an inner tube and the car turned over to the north. When it hit, the car just scooted sideways and tipped over against the pole. He was running about twelve or fifteen miles an hour when he hit the pole, but it was "kind of skidding along." He was thrown out to the north of the pole. His wife and children were also thrown out and injured at the same

time. His leg was broken. He never recovered the use of his foot, which flaps down on the floor when he steps and causes him to catch his toes and stumble if he is not very careful.

On cross-examination, plaintiff testified: That he had driven his car on each of the twenty-three days he had owned it, except one. The weather had been good, except the day after he got the car. Before purchasing this car he had driven the cars of Guy Watts and Mr. O'Brien—four to six times. O'Brien and Jim (Watts) taught him how to run his car. They just showed him how to use the brakes and feed the machine, and then he proceeded to drive it himself. During the twenty-three days, when he was driving his car, he was learning, at the same time. The driving during those twenty-three days was part of the learning. During that time, he had sometimes come to St. Joseph in his car along the same road, crossed the same culvert in the day time, and made the same turn in the road, and had passed by the same pole each time, but never paid any attention to the pole. Did not know how tall the pole was. The grass and weeds there were dry and shriveled up. Never saw anyone drive between the pole and the north fence. Lived near Saxton all his life. Had been along that road a great many times in wagons and buggies. There was no place for a team to get 'round between the pole and the fence. The pole was eight or nine feet south of the fence. The road there sloped to each side. As he approached the culvert from the south, there were no teams nor foot passengers around. He had the road all to himself. Before that, on other days, he had crossed the culvert and rounded the curve and gotten by without any trouble. He made the corner all right without striking the pole or his car skidding. On this trip, he had turned out more to the right side than he had ever done before. Before he turned to the right, coming from the south, he was traveling in the middle of the main traveled road. Did not know how much he did swing over to the right. His best judgment was two or

three feet.  But this was more than on other days.  No one was trying to pass him, but he swung over more to the right,  because, he says, "Well, I always had—I thought I was learning more about the car that way—to keep on the right-hand side of the road, and I was trying to follow instructions."  The swinging over to the right on this day was part of his trying to learn to run the car.  A part of the instructions he had received about running a new car.  He was about  eight  or ten feet south of the culvert when he began to swing out. The road over the culvert, right in the center, was smooth, hard and good.  There were some clods over to the right, small round things.  It was not as smooth and level over there as it was in the center.  The culvert was about thirty-eight feet long and had cement retaining walls on each end.  He went twelve, fifteen or twenty feet after he began to skid.  "They just had it kind of jumping along  there in  making skids."  The little clods would not let the wheels take upon the road.  They obstructed the natural movement of the wheels.  The car began to skid just as he had  crossed  the culvert. When he turned his wheel to guide the car back into the road the clods would not let it back; the wheels would slide.  "That is what I call skidding—my car never skidded any other way."  It skidded towards the northwest.  The skidding continued from the time his hind wheels were leaving the culvert until the accident. It was getting "better," and "if I had a few feet further to have gone I would have missed it."  The skidding got "better," but did not get "better early enough."  He did not think he was going at the same rate of speed (as before) when he began to skid.  He had his gasoline all shut off.  He shut the gasoline off before he turned the corner.  He thought he crossed the culvert at twelve or fifteen miles an hour.  He never put on his brakes, but he thinks he slowed up a little before he began to skid, as the car was getting no gasoline.  In his judgment, he was going twelve or fifteen miles an hour when he began to skid.  But he never put on his brakes.  All the wheels began skidding; could not tell which one started first. He

did not have time to do anything to overcome the skidding. The pole with which he collided was about thirty-five or forty feet west of the west end of the culvert. Just as soon as he noticed it skidding, he tried to get it back in the road. He turned his front wheels south. He did not keep on turning south. There was no use in turning it too short. "I turned it as short as I thought it would bear." Just turned it short and kept the front wheels turned that way, but the hind wheels and front ones, too, kept going north. He could change its course but little, if any. Just as soon as he was across the culvert, he tried to get his car to take to the south—wanted to get back in the road. He saw this pole as soon as he began to skid. He saw the ditch at the same time. He then made his efforts to avoid hitting the pole. After he got turned there was nothing to prevent him seeing the pole. There was nothing to prevent him from seeing the pole when he was in the middle of the culvert, if he had known it was there. He paid no attention. He did not think anybody would stick a pole out in the road. By paying no attention, he meant, to the side of the road. Did not have his eyes or mind on the pole. He could have seen both the fence along there and the pole, had he looked. He was not paying any attention to the fence or to just where the pole was situated. If he had looked, when he was in the center of the culvert, he could have seen the pole. The accident happened about ten o'clock in the morning. The sun was shining. The first time he saw the pole was just after he had crossed the culvert. The way the pole stood with reference to the fence line did not deceive his sight after he crossed the culvert. If he said the first time he saw the pole he was within four or five feet of it, he was just guessing at it. He was not that close to it. He noticed the pole about the time his hind wheels left the culvert, and the car went fifteen or twenty feet before it struck the pole. The pole with which he collided was something like ten or twelve feet north of the center of the main traveled part of the road. There was at that time a well traveled beaten-down part of the highway. He was not on that

part at the time of the accident. The pole, as it stood there at that time, did not interfere with anybody traveling along the well traveled hard-beaten part of the road. If he had stayed where he was, or in that part of the road where he was before he began to swing to the right, he would not have struck the pole. If he had stayed on the usual hard-beaten, traveled part of it, he would not have struck the pole. At that time, as he was traveling, he did not have to swing over to the right. He did that as part of the instructions that had been given him in using a new car. The black line, which the witness made upon the defendant's "Exhibit 2" in the case, to the best of his knowledge and belief, indicates just where the north side or north wheels of his car traveled. Plaintiff's "Exhibit A" is a fair representation of the situation approaching the culvert from the south and looking to the north. The soil composing the roadway was gumbo and becomes "kind of rough" when it dries after being muddy. Where the pole sets in the ground, the ground was about a foot lower than the center of the road. The ditch at the culvert on the north side of the road was four to six feet deep, and right at the pole was about a foot and a half deep, and the ground at the base of the pole was a foot and a half above the bottom of the ditch.

There were no other witnesses to the accident. The other testimony in the case did not differ materially from that of the plaintiff as to the condition of the road and location of the pole. In the view we take of the case, it is not necessary to set out the further proceedings at the trial except to say that the court refused to give a demurrer to the evidence asked by the defendant at the close of the plaintiff's case and also at the close of all of the evidence.

I. The first question to be decided in this case is whether the plaintiff in driving his car was bound to use "the highest degree of care that a very careful person would use under like or similar circumstances," as required by Section 12, par. 9, Laws 1911, page 330. When this case was tried below this court had not construed said statute

Degree of Care.

with reference to the driver's contributory negligence, but since then, in the case of Threadgill v. United Rys. Co., 279 Mo. 66, 214 S. W. 161, this court has held, GRAVES, J., delivering the opinion, that if the person driving the automobile is injured in a collision with a street car, the statute applies to the plaintiff, although he is the injured party, and that he must, under the statute, exercise the highest degree of care of a very careful person, in driving his automobile, and if he fails to do so, he violates the statute and is guilty of contributory negligence. In his opinion, concurred in by all of the court of this Division, Judge GRAVES, 214 S. W. l. c. 164-165, says:

"As stated, the court modified the instructions for plaintiff by adding thereto a clause which placed upon her driver the duty of exercising the highest degree of care in the running of the machine. This the appellant assigns as error. Respondent urges that such degree of care is required by State statute, and that the court committed no error in so wording the instructions. Paragraph 9 of Section 12, Laws 1911, page 330, reads:

" 'Any persons owning, operating or controlling an automobile running on, upon, along or across public roads, streets, avenues, alleys, highways or places much used for travel, shall use the highest degree of care that a very careful person would use, under like or similar circumstances, to prevent injury or death to persons on, or traveling over, upon or across such public roads, streets, avenues, alleys, highways or places much used for travel. Any owner, operator or person in control of an automobile, failing to use such degree of care, shall be liable to damages, to a person or property injured by failure of the owner, operator or persons in control of an automobile, to use such degree of care, and in case of the death of the injured·party, then damages for such injury or death may be recovered, as now provided or may hereafter be provided by law, unless the injury or death is caused by the negligence of the injured or deceased person, contributing thereto.' It

would seem that this statute fixes upon the driver of an automobile the duty to exercise 'the highest degree of care that a very careful person would use, under like or similar circumstances.' The Springfield Court of Appeals, in England v. Railroad Co., 180 S. W. 1. c. 34, has so ruled. On the other hand, the Kansas City Court of Appeals, in an opinion by BLAND, J., in case of Advance. Transfer Co. v. Railroad, 195 S. W. 1. c. 568, has taken the opposite view . . . To like effect is Hopkins v. Sweeney Automobile School Co., 196 S. W. 1. c. 774, where the Transfer Co. case, supra, is cited and approved, . . . Both cases were handed down at the same time, and hence the cross-references.

"What these two cases really hold is that, as to the driver of an automobile who is injured, or whose machine is injured, or damaged, only the rule of ordinary care is applicable. They say that the statute requiring the highest degree of care is one applicable to persons traveling on or over the streets or highways; that as to such persons traveling on or over such highways he owes the highest degree of care, but as to himself, his property, or those with him, only ordinary care is required. We cannot take this view of this statute. We think that it contemplates a rule of conduct for automobile drivers upon 'public roads, streets, avenues, alleys, highways, or places much used for travel.' That rule of conduct is to use 'the highest degree of care.' . . . The person driving a motor vehicle has a rule of conduct prescribed for him by this statute. That rule of conduct is the use of the 'highest degree of care.' A failure to reach the standard prescribed by the law is negligence, and, if the negligence contributed to his injury, he cannot recover. As said before, this statute prescribes a rule of conduct. If a violation of the statute occasions injury to others, the person violating it is liable in damages. If, on the other hand, the violation of the statute occasions injury to the person violating it, such person cannot recover for injury to himself,

24—281 Mo.

which injury was contributed to by his own wrongful violation of law. His failure to use the highest degree of care is contributory negligence. The amendments to the instructions were proper. They but presented the idea of contributory negligence. They fixed the standard of duty as fixed by the law. The rule of the Kansas City Court of Appeals in the cases cited is wrong.''

It is thus seen that the statute establishes a general rule for all persons operating automobiles upon the public roads and highways not only to protect the lives and property of others on or traveling over such roads and highways, but also to protect such drivers themselves and the persons traveling with them.

Respondent's learned counsel suggests that the statute does not apply in this case, because the telephone pole was an illegal structure in the road or highway, in that it incommoded travel and was nine feet south of the north line of the road, and the statute (Sec. 3326, R. S. 1909) only authorizes telephone companies to set their poles in the roads and streets "in such manner as not to incommode the public in the use of such roads.'' Without deciding whether, under the evidence, the defendant's pole was illegally in the road or did "incommode the public in the use of such road" within the proper meaning of the statute, we think this distinction is not tenable, because the automobile statute was intended to protect the drivers of such automobiles from injuring themselves or others without regard to whether they were injured by running into an obstruction or property of others which was in the road lawfully or otherwise.

We must, therefore, rule that the Automobile Statutes of 1911 applied to the plaintiff in this case, and that if he failed to exercise the high degree of care required by that statute in driving his machine he was guilty of contributory negligence.

II.   The next question is whether the plaintiff was, as a matter of law, guilty of such contributory negli-

gence.    Ordinary care is such care as would ordinarily be exercised by an ordinarily careful person under the same or similar circumstances.    If the employment is a dangerous and hazardous one, ordinary care would require an ordinarily careful person to exercise a correspondingly greater degree of care to avoid injury to himself or others.    But the Legislature in and by said statute has gone beyond the requirement of ordinary care on the part of drivers of automobiles on our streets and highways by providing that they shall exercise the *highest* degree of care, which would be used —not by an *ordinarily* careful person—but by a *very* careful person under like or similar circumstances.    The automobile is not of itself a necessarily dangerous agency, like an animal *feræ naturæ,* so that it cannot lawfully be driven on a highway, nor is it a Juggernaut purposely constructed to crush out the lives of men, but by reason of its great weight and power with which it may be propelled, it becomes exceedingly dangerous to the lives and limbs of others on the highways and to the driver and occupants of the car, unless the highest care and caution is used by the driver. An automobile will not keep in the road, nor guide nor drive itself, as will, to a degree, a well-broken team of horses.    The driver of an automobile must depend wholly upon himself and his own care, skill and caution to guide his car safely.    All persons are not qualified to run an automobile.    It would be the greatest carelessness for a wholly inexperienced person without previous instructions from competent persons to undertake to do so.    It requires not only theoretical knowledge of how to manipulate the various parts of the machinery, but practical experience in so doing, to render a person competent to drive an automobile.    There is no doubt these considerations were in the mind of the Legislature when the statute of 1911 was enacted.    Under this statute, if all the circumstances considered, reasonable men might honestly differ as to whether the driver exercised the highest degree of care of a very careful person, then the question of his contributory

negligence is for the jury. But, if his failure to exercise *the highest* degree of care of a *very* careful person is apparent to all reasonable men from the undisputed facts shown by the plaintiff's own testimony, then it is the duty of the court to so declare as a matter of law. [Monroe v. Chicago & Alton Railroad Co., 280 Mo. 483.] In the case before us, it was not only broad daylight, but there were no other vehicles or pedestrians in the road. The road was well graded, practically level, except where it sloped toward the ditches on each side. It was in the open country, with no buildings or other objects to obscure or distract the plaintiff's view. The plaintiff was perfectly familiar with the road, having traveled it for many years before the accident. Although he had had his machine for but twenty-three days and was evidently somewhat inexperienced and not an expert in handling it, he had during that period at different times crossed the same culvert and made the same turn in the road without any difficulty. The main or generally traveled portion of the road was smooth and dry and of abundant width to drive and turn on safely and without inconvenience. On this occasion plaintiff says he was traveling from twelve to fifteen miles an hour and drove in the center or most traveled portion of the road until just as he was approaching the turn, when he guided his car to the right *a greater distance than usual,* and then in turning to the left got on to rough ground or hard gumbo clods which caused his car to jump and skid and become unmanageable, and for that reason he could not guide it away from the (guy) telephone pole on the north side of the road near the gutter, so as to avoid striking it.

The pole was thirty or forty feet west of the west end of the culvert. The culvert ran diagonally from southwest to northeast. Plaintiff's car commenced to skid when its rear wheels left the culvert, which must have been fully thirty or forty feet from the pole as he crossed the culvert east of the center. At one place plaintiff says he was going twelve to fifteen miles

per hour when he hit the pole. At any rate, he hit the pole with considerable force and his car was still skidding, but not quite so badly as it had been, although he had turned the power off before crossing the culvert.

The statute (Paragraph 3 of Section 8 of the Automobile Act, Laws 1911, p. 327) did not require the plaintiff to pass to the right of the center in approaching the turn in the highway, as he did; that section only makes such requirement when a person operating a motor vehicle shall meet in a public highway another person riding or driving a horse or another vehicle. [Lovejoy v. Dolan, 64 Mass. 496.] In this case, there were no other persons or vehicles upon the road, and the plaintiff had the right to use the center or left side of the road, and had no reason to drive his machine out of the beaten path to the right over the rougher ground and clods. He frankly says there was no occasion nor necessity for his doing so, but he did so in order to practice keeping to the right-hand side of the road, as he had been instructed to do. He was learning to drive his car in so doing. He also says that if he had kept in the middle or smooth part of the road, he would not have struck the pole. If turning a corner in the road over rough ground or hard clods will cause a car to skid, then it is self-evident that a *very careful* person with no more experience than was had by the plaintiff, using the highest degree of care, would not unnecessarily—when there was no occasion at all for doing it—leave the smooth and beaten track and drive over such rough ground or clods in making such turn. It will not avail the plaintiff to say that the evidence does not show that he knew that cars would skid in turning on rough ground or clods, such as he encountered. A *very* careful person exercising the highest degree of care, venturing to drive a car upon the public highway at such speed as to skid with the power off 30 or 40 feet over dry clods or rough ground as did the plaintiff, would before so doing, at least, inform himself as to the common conditions and places in the

road which may cause cars to skid. In this case, the evidence shows, and it is well known, that cars will skid in making a turn on rough ground or hard clods—a very common condition to be found on our country roads.

In the Monroe Case, supra, it is ruled that the statute "does not mean the highest degree of prudence or skill which could be conceived as possible to man. They are only held to the *highest degree which has been demonstrated to be practicable.*" It obviously was practicable for the plaintiff to keep in the middle of the road, where it was smooth and generally traveled by the public, and not voluntarily leave it for experimental purposes only and drive over rough ground or clods and thereby cause his car to skid and become unmanageable and collide with the pole. Even old Dobbin, when he was the mighty master of the highway, would have followed the beaten path and kept out of trouble, for, as stated by plaintiff's learned counsel, plaintiff "had traveled over that road for years; but previous to getting his Ford car, we can assume his horses followed the beaten path, so that the guy or stub pole had never been brought to his attention."

The plaintiff's violation of the statute is clear and constituted · contributory negligence. That such negligence contributed to his injury is beyond question. We hold, therefore, the lower court erred in refusing defendant's demurrer to the evidence. The judgment of the lower court is reversed. *Brown* and *Ragland, CC.,* concur.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opionion of the court. All of the judges concur; *Blair, P. J.,* in result.