NANCY LOWERY, Appellant, v. KANSAS CITY, a Municipal Corporation.—85 S. W. (2d) 104.

Division One, July 9, 1935.*

---

*NOTE: Opinion filed at September Term, 1934, April 17, 1935; motion for rehearing filed: motion overruled at May Term, July 9, 1935.

*Harry G. Kyle* and *Walter A. Raymond* for appellant.

*George Kingsley, James R. Sullivan* and *Arthur R. Wolfe* for respondent.

HYDE, C.—This case, coming recently to the writer, is an action for damages for personal injuries. Plaintiff obtained a verdict for $10,000, but the court granted defendant a new trial, ''on account of misconduct of witnesses, and for the production and use of mutilated hospital records,'' and from this order and judgment plaintiff has appealed.

The facts concerning the accident as related by plaintiff's witnesses are stated in plaintiff's brief, as follows:

"The Armour-Swift-Burlington bridge is a bridge across the Missouri River connecting Kansas City, Missouri, with Clay County. It was one of the two bridges permitting passage from Kansas City into Clay County. It was directly connected with . . . streets of Kansas City. *The place where this accident occurred was seventy-five or one hundred feet north of the south end of the approach to this bridge.* It was located within the corporate limits of Kansas City, Missouri, which extended to the center of the main channel of the Missouri River. Previous to July 14th, 1927, the bridge in question was privately owned and operated as a toll bridge. On the date mentioned such bridge was conveyed to the Highway Commission of the State of Missouri by deed setting forth the agreement between the bridge company, defendant Kansas City, Missouri, Clay County, and the State Highway Commission of Missouri. Kansas City, Missouri, and Clay County paid the purchase price. . . .

"At the point where this accident occurred there was a steel girder above the surface of said bridge extending lengthwise north and south. This girder rose to a height of two feet and seven inches above the surface of the bridge. The girder was sixty-seven feet nine inches long and was eighteen inches wide. This girder was located thirteen feet five and one-half inches west of the east curb on said bridge. It was shaped like a sled runner upside down. This girder was 'as near the color of the pavement as it could be. It was a dirty grey.' Because of its identical color with the pavement it blended in with the pavement and was very difficult to see. There had been a light on the south end of this girder until sometime in March, 1929, when it was broken. There had been no light on the end of this girder for about four months before the accident. On the night in question (June 30, 1929) about 9 P. M. plaintiff and her husband were riding in the rumble seat of an automobile being driven and operated north on the highway and over the A-S-B bridge; this automobile was being operated north on said bridge between ten and fifteen miles an hour. There were a lot of cars traveling over the bridge at that time. The car in which plaintiff was riding was to the left or west of another car going in the same direction. Suddenly the left front wheel of this automobile struck the girder, rolled up on top of it and went along until the back wheels struck and turned the car over; none of the occupants of the car saw the girder before the accident." (Our italics.)

The ground upon which the court granted defendant a new trial was one that had to do solely with the issue of the character and extent of plaintiff's injuries. Plaintiff contends that this ground was not one which was covered by defendant's motion for a new trial. Defendant says that, whether this ground be good or not, there are other grounds upon which the court should have granted a new trial. As to such grounds, "respondent has the burden to dis-

cover and point out errors, if any, not assigned by the court, sufficient to justify the court's action in granting the new trial." [Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S. W. (2d) 119; Sakowski v. Baird, 334 Mo. 951, 69 S. W. (2d) 649. ■ Since one of the grounds relied upon by defendant is decisive of the case, it will be first considered. This ground is defendant's contention that it owed no duty to plaintiff concerning the bridge or the maintenance of lights thereon because "at the time of the alleged accident the ownership, possession, control and the duty of maintenance and repair of the A-S-B bridge and the bridge girder complained of were in the State of Missouri, and under the sole and exclusive jurisdiction and control of the Missouri State Highway system."

Plaintiff contends that the part of the bridge within the city limits is a public street of the city. Plaintiff relies upon Boyd v. Kansas City, 291 Mo. 622, 237 S. W. 1001, which was such a case. Plaintiff's position in this matter is stated in plaintiff's brief, as follows:

"This is a case where there was a dangerous defect in a public highway or street. Under such circumstances there is a duty on respondent to maintain a light. . . . The street was not reasonably safe for travel with this unlighted pier standing there on the roadway. . . . The state highway runs through North Kansas City and connects with the north end of this bridge. . . . The south end of this bridge is within the corporate limits of Kansas City and constitutes a public thoroughfare and street in such city. . . . Kansas City could not have delegated to the State its duty to maintain this public highway and street in a reasonably safe condition for travel."

Plaintiff's petition based her cause of action entirely upon the city's common-law duty with regard to keeping "the public streets within its corporate limits in a safe condition and fit for public travel." The charges of negligence made in plaintiff's petition were:

"That it negligently caused and permitted said girder to be and remain in said public street within the corporate limits of said city; that it negligently failed to place a signal light or other warning signal for or near said girder to warn people traveling said street of its presence; that it negligently caused and permitted said girder to be and remain in said street where said girder constituted an obstruction to traffic; that it negligently failed to remove said girder after it knew or by the exercise of ordinary care could have known said girder was an obstruction to traffic and dangerous to persons traveling said street."

In this connection, it should be noted that in submitting the case plaintiff's instruction did not submit the charge of negligence of failing to remove the girder, but only the failure to have a light

on it; but that by plaintiff's instruction, the jury were not limited to finding for plaintiff on the theory that the highway was a public street of the city which was not reasonably safe for public travel, without a light on the girder. Instead, this instruction authorized a verdict on the theory ''that the defendant had agreed with the State Highway Commission to provide and maintain always adequate lighting fixtures . . . and to furnish adequate light . . . and that the defendant in violation of regulations of the State Highway Commission . . . failed to place and maintain a signal light on or near said girder.'' This instruction clearly broadened the issues made by plaintiff's petition, and authorized a verdict on a charge of negligence not pleaded therein, which is another ground urged by defendant for sustaining the trial court's action in granting it a new trial, by submitting not merely the city's liability for violation of its common-law duty with regard to the safety of its public streets, which was all that was pleaded, but by submitting the violation of a duty, which it is contended the city had assumed by reason of the contract entered into with the State Highway Commission at the time the bridge was acquired, which was not pleaded. Plaintiff says that this was proper because her cause of action on the duty arising under the contract was one in tort. Even though it be true that nothing was submitted which could not be classified as a tort action, nevertheless an issue was submitted which was not pleaded. The evidence regarding this issue including the contract itself was admitted over the objection of defendant, and the instruction submitting such an issue, outside of the pleadings, was clearly error, which constituted a sufficient ground for granting defendant a new trial. [Kitchen v. Schlueter Mfg. Co., 323 Mo. 1179, 20 S. W. (2d) 676; Gandy v. St. Louis-San Francisco Ry. Co., 329 Mo. 459, 44 S. W. (2d) 634, in which earlier cases are cited; Pearson v. Kansas City, 331 Mo. 885, 55 S. W. (2d) 485; State ex rel. Ebert v. Trimble, 333 Mo. 711, 63 S. W. (2d) 83.]

However, this case ought not to be sent back for a retrial on that ground without determining whether or not defendant could be liable at all, under the facts as to how and where plaintiff was injured, about which there is practically no dispute. The situation in regard to the ownership of the bridge and its acquisition is that, prior to 1927, the bridge, which had been constructed across the Missouri River under authority of an act of Congress and upon plans approved by the Secretary of War, was owned and operated as a toll bridge by the North Kansas City Bridge & Railroad Company, a Missouri corporation. The bridge had two decks; the lower deck was used solely for railroad tracks; the upper deck was used for street cars, vehicles and pedestrians. Between the two decks were electric, telegraph and telphone wires, and gas mains. In the center, there was a lift span, which allowed the passage of steam-

boats navigating the river. The upper deck was divided into three definite roadways. In the center there was a roadway wide enough for vehicles traveling in both directions and there were also two street car tracks. On each side, there was a roadway wide enough for one-way vehicular traffic. There were also walks for pedestrians on each side of the bridge. The girder in question was between the center roadway and the one-way roadway on the east side of the bridge. There were other girders and parts of the superstructure of the bridge between the center roadway and the one-way roadways on the sides. The bridge had been so constructed and remained in that condition up to and after the time of the accident. In 1926, the people of Kansas City and of Clay County, desiring that the bridge be made free, voted bonds at the general election in November in the sum of $1,500,000; one-tenth of this amount was voted by the county, and nine-tenths by the city. Thereafter, at the 1927 session of the Legislature an amendment was adopted, which covered this situation, to what is now Section 8139, Revised Statutes 1929 (enacted Laws 1923, p. 354). This section had originally provided that bridges constructed over navigable streams, either with State funds or with State and local funds, and tendered free in good repair to the State Highway Commission, should be regarded as part of the State highways and maintained by the commission. The 1927 amendment included, within its provisions of the statute, easements over privately owned bridges so that said section now reads:

"All bridges which have heretofore been constructed . . . either entirely with state funds or in part with state funds, and local funds, 'or with local funds *or any easement over any privately owned bridge now or hereafter constructed or built'* in good repair which may be tendered free and without consideration to the State Highway Commission, and which bridges are located at points where such streams intersect the state highways, . . . shall be regarded as part of the state highways, and all such bridges shall be maintained by the State Highway Commission."

In July, 1927, soon after this section as amended went into effect, a deed and agreement was entered into between the bridge company, the city, the county and the Highway Commission which recited the facts about the building of the bridge and the voting of bonds and further stated that "as said bridge is located at a point where said river intersects the State highway system, it is the purpose of the City and County to purchase and acquire said bridge and the approaches thereto between the points herein named, to constitute a free highway across the Missouri River connecting Kansas City, Missouri, with Clay County, Missouri, for the free passage of automobiles, wagons, vehicles of all kinds, and animals and pedestrians, and to tender the same free and without consideration to

said Commission, so that the same shall be regarded as and made a part of the State highway system and be maintained by the State Highway Commission in good condition and repair as herein provided.'' The agreement then provided that, in consideration of the bridge ''becoming and constituting a part of the State highway system and maintained as such by said Commission,'' the title ''to said bridge and approaches thereto,'' acquired by the city and county from the bridge company with the bond money, was forever quitclaimed to the State of Missouri. This was stated to be only the upper deck of the bridge; the bridge company reserving the lower deck for railroad tracks, reserving other portions of the bridge necessary for telegraph, telephone and electric lines and gas maines, and reserving the right to maintain street car tracks, on the upper deck, which tracks the bridge company agreed to keep in repair. The bridge company also remained responsible for the operation, maintenance and cost of raising and lowering the lift span. The Highway Commission accepted the title in the name of the State, assumed the perpetual maintenance of the bridge and approaches thereto, except that part assumed by the bridge company, and was given ''full power and authority to improve, add to, widen, extend, replace and reconstruct the upper part of said bridge and the approaches thereto.'' It was specified that certain improvements for reconditioning of the bridge should be immediately made by the Commission. The only obligation assumed by the city was the following:

''The city agrees to provide and maintain always adequate light fixtures and equipment on said bridge and to furnish adequate light for the lighting of said bridge at their own cost; provided such fixtures and equipment shall be installed under plans approved by the Commission and the Bridge Company, and shall be thereafter maintained in accordance with the regulations of the Commission.''

It was shown that there were poles, with electric lights thereon, at regular intervals all the way across the bridge on each side thereof. The city owned and operated a municipal light plant which furnished the current to light these lights. The State Highway Department kept a patrolman on the bridge all day. He turned on these lights before dark, when he left the bridge and turned them off when he came in the morning. There was no evidence whatever of any regulations, in regard to either installation or maintenance of lights, lighting fixtures or equipment, made by the Highway Commission. Highway employees had supervision of the bridge and its maintenance and had instructions to report any lights out of order to the city hall. The light which had been on the girder was about four inches in diameter and ''stood up'' on a piece of iron pipe about two and one-half feet high. It was shown that it was knocked off by a Ford coupe running straddle of the girder

almost four months prior to the date when plaintiff was injured. It was not shown that any employees of the Highway Commission did report to the city hall that the light was broken off the girder or that the Highway Commission required a light to be maintained there.

We think it is clear from the circumstances under which the bridge was acquired and the provisions of Section 8139, Revised Statutes 1929, authorizing its acquisition by the State, that the entire bridge is a part of the State highway system. It is not and never was a public street in the city. The bridge was originally a toll bridge owned by a private corporation. It was certainly not a public street at any time it was a toll bridge. Any liability for maintaining it in safe condition for public travel was upon the company which owned it and not upon the city. How did the city become liable therefor or assume any such duty? The city never owned and operated the bridge. The title was transferred, as a result of the agreement of July, 1927, from the bridge company to the State and, immediately after the bridge ceased to be a toll bridge, it became a part of the State highway system. Cases, such as Pickett v. C. & N. W. Ry. Co. (N. C.), 158 S. E. 398, and McCracken v. Curwensville (Pa.), 163 Atl. 217, cited by plaintiff, to the effect that a city is not relieved of its duty of keeping one of its streets in safe condition for travel, because the street is designated as the route of a state highway through the city even though work is done by the State thereon, are obviously not in point. Plaintiff, therefore, had no cause of action against the city upon its common-law duty to maintain its streets in safe condition for travel because the place where plaintiff was injured was not a city street. What obligation did the city assume, which made it liable to plaintiff, by the contract between it, the county, the bridge company and the State? The following argument made in plaintiff's brief, shows that plaintiff is not relying solely upon, either, defendant's common-law duty as to safety of streets, or upon a duty arising under the contract, but upon a combination of both, namely:

"Respondent was guilty of negligence in violation of its common-law duty to maintain its public streets and highways. Respondent denied it owed such duty with reference to this place in the public streets and highways. The deed or agreement setting out its contractual agreement to maintain lights at this place was admissible to show its duty. The negligent failure to perform this duty gave plaintiff a cause of action *in tort*. . . . There was, therefore, no variance between pleading and proof. . . . The deed and contract were entered into for the express purpose of making this bridge a free public thoroughfare for the benefit of plaintiff and all other members of the public. In such situation plaintiff, being a party intended to be benefited, had a right to maintain the suit

*on the negligent performance of the duty created by this contract*
and this too in spite of the fact that the State Highway Commission as an arm of the State would not have been liable.''

Plaintiff clearly recognizes that the place was not a place toward which defendant had any duty before the contract was made, so plaintiff's position must come to this: That the toll bridge was made a public street of the city (up to the middle of the river at least) by the contract; that it became the city's duty to mark the girder by a light, not because it had by the contract agreed to furnish lighting equipment and current to light a portion of a state highway, but because it had by the contract made that portion of the bridge one of its public streets; and that, in agreeing to furnish lights there, it was only recognizing its duty with reference to a place which the contract made a public street. On no other theory could plaintiff claim that there was no variance between its pleading and proof. Yet, on the other hand, if the bridge became a public street of the city and the girder was a dangerous obstruction to travel over it, no contract with the State to light it would be necessary to place the duty of safeguarding upon the city. Upon any view, it would seem that there remains no basis for plaintiff's cause of action when it appears that the place where plaintiff was injured was not a public street of the city.

██ There are, therefore, the following reasons why plaintiff cannot recover on the showing made in this case.

First: Even though defendant could be liable to plaintiff for violating its contract, plaintiff failed to show that defendant violated its contract with the State Highway Commission by failing to maintain a light on the girder, because there is no proof of any regulations of the commission requiring a light to be on the girder.

Second: Plaintiff's petition pleads a cause of action for defendant's violation of its common-law duty to the public to keep its public streets in a reasonably safe condition for travel, while its proof definitely and conclusively shows that the place where plaintiff was injured is not and never was one of its streets.

Third: Plaintiff failed to show that any duty which defendant would owe to plaintiff, with respect to the safety of the place where plaintiff was injured, was created by the contract concerning the bridge.

This latter proposition is true because the obligation which defendant assumed under the contract, in evidence, was an obligation to the State of Missouri and not to plaintiff. A fundamental test of whether one person has a cause of action in tort against another is: Did the person, sought to be held liable, owe to the person, seeking to recover, any duty, to do something he did not do, or not to do something he did do? If so his failure to do what he ought to have done or his doing what he ought not to have done con-

stitutes a legal wrong, whether it be intentional or merely negligent, for which the person injured thereby can recover, except where his own fault is a contributing cause. [26 R. C. L. 757, sec. 3; 62 C. J. 1095-98, secs. 6-12; 3 Cooley on Torts, 363-369, sec. 478; Bishop, Non-Contract Law, 199, sec. 446; Pollock on Torts, 534, note.] Most frequently such duty arises from the relations in which the parties are placed, toward each other, by the circumstances of the case. A man driving an automobile on a public street owes a duty to a pedestrian crossing the street to exercise such care as is required by the circumstances (place, weather, visibility, traffic, etc.) not to injure him. This may require that he reduce his speed, sound his horn, put on his brakes, or swerve to one side. Likewise everyone owes a duty to every other individual member of the traveling public not to put anything or to allow anything, over which he has control, to be in a public street so that it will become dangerous obstruction to travel thereon, and this includes a municipal corporation as well as any other corporation or individual. A municipal corporation, having complete control of its streets, has also a duty to keep them in repair so that the surface will not be dangerous to persons traveling upon it. [See Nimmo v. Perkinson Bros. Const. Co., 85 S. W. (2d) 98.]

Duties, which may be the basis of a tort action, may, however, be created in some other manner than by the circumstances of the case. For example, they may be imposed by statute or ordinance. If so, and a violation of such prescribed rule of conduct is shown, it is not necessary to inquire what duty would arise from the circumstances, and we say that this is negligence *per se*. An obligation may, likewise, be assumed by contract, out of which may arise a duty to others than the other party to the contract. [For review of cases see note 38 A. L. R. 403, 487-505.] "Though a tort is a breach of a duty which the law in distinction from a mere contract has imposed, yet the imposing of it may have been because of a contract or because of it and something else combining, when otherwise it would not have created the duty," but breach of contract may only "be treated as a tort . . . where the law casts its separate obligation." [Bishop, Non-Contract Law, 30-31, secs. 73-76; 1 Cooley on Torts, 168, sec. 60; Pollock on Torts, 535, 644; 62 C. J. 1099, sec. 13; 26 R. C. L. 758, sec. 4, p. 768, sec. 17.] That is the kind of a case which plaintiff now argues was made here, but plaintiff to recover upon that theory must show, not merely that defendant assumed an obligation under the contract, but that out of that obligation there arose a duty to her. When a contractor takes possession of a portion of a public street for the purpose of repairing it, even though he has the right to exclude the public from that portion, his contract, to maintain certain barriers and lights or other warning devices, in an obligation which is intended to create

a duty to every individual member of the public who uses the streets, and he is liable in tort for a breach of that duty. However, the city in that situation was and remains liable to members of the public traveling the streets because it owed them a duty not to put even temporary and necessary obstructions in the way of travelers without adequate warning. The contractor assumes the same duty by his undertaking to do such work in a public street and his duty as to the kind of precautions to be taken to protect the public may properly be fixed by contract.

Since this bridge was not a city street but a highway under the exclusive control of the State, which acts with respect to such highways only in a governmental capacity, it is clear that neither the State nor the city would have owed any duty to the public, for the violation of which a tort action could arise, to have a light anywhere on it, if nothing had been said in the contract about lights. Not every obligation assumed toward the State, in the exercise of its governmental activities, is a duty to the individuals of the public. A policeman, who is given the duty of keeping a lookout for thieves, owes that duty to the public as a whole as represented by the State, but he is not liable to the owner of a house which is robbed because the policeman went to sleep on his beat. [2 Cooley on Torts, 389, sec. 300.] Even a city is not liable for injuries caused by negligence with respect to devices or lights in its public streets or conditions in its public buildings which it is using while acting in its governmental capacity. [Pearson v. Kansas City, 331 Mo. 885, 55 S. W. (2d) 485; Auslander v. St. Louis, 332 Mo. 145, 56 S. W. (2d) 778; Prewitt v. St. Joseph, 334 Mo. 1228, 70 S. W. (2d) 916; Lober v. Kansas City (Mo.), 74 S. W. (2d) 815.]

What duty, to the public traveling on the bridge, did the city assume by contracting to furnish lighting fixtures, equipment, and electric current without cost to the State? The city had not placed the girder in question on the bridge, had nothing to do with it remaining there, and had no authority to remove it. Why did it owe plaintiff a duty to put a light on it? It only contracted to install and maintain fixtures and equipment in accordance with the plans and regulations of the commission. If there was a hole in the floor of the bridge, would it be contended that the city owed a duty to the traveling public to put a light on it? If it had any duty to put a light on it, would it not also have a duty to put up a barrier around it? If the highway patrolman, who was instructed to turn the lights on before he left the bridge at night, forgot to do so, would the city be under any duty to send someone out to turn them on? The city did not have control of the bridge where these lights were; it did not have anything to say about when they were turned on or whether they were turned on at all; and, therefore, it had no duty to inspect the fixtures and lights to see if they

were all working properly. We hold that under this contract its obligation to the Highway Commission was only to replace them at its own cost on request and to furnish, free, the electric current which was used to light them. We, therefore, hold that under all the circumstances, the city owed no duty to individuals, crossing the bridge.

The order granting a new trial is affirmed and the cause remanded. *Ferguson* and *Sturgis, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Coles, J.,* not sitting.

### ON MOTION FOR REHEARING.

HYDE, C.—Appellant's motion for rehearing says that the statement in the opinion that "the city never owned and operated the bridge" is incorrect. Appellant says that the city "did own the bridge for one day" and that "its ownership of the bridge automatically converted this public highway into a public street;" and that "this fundamental error of the court entirely destroys the foundation of the opinion herein since the whole opinion rests on the court's conclusion that the place in question was not a public street." Appellant's contention is based upon the fact that, although there was only one written instrument which was signed by all parties, which provided for the transfer of an easement over the upper deck of the bridge from the bridge company to the city and county, and from the city and county to the State, the bridge company, Kansas City and Clay County executed and acknowledged the instrument on July 14, 1927, at Kansas City, while it was executed and acknowledged by the State Highway Commission on July 15, 1927, at Jefferson City.

Certainly this instrument was intended to cover the entire transaction to get the title to the easement from the bridge company to the State and did not go into effect piecemeal, step by step, as each party signed and acknowledged it. On the contrary, in the absence of any showing otherwise, we must hold that this instrument, like any other instrument of conveyance, went into effect only when all parties had signed and acknowledged it and it was delivered to the State. Moreover, it did not purport to convey the easement outright to Kansas City but conveyed "unto said city, its assigns and successors an undivided nine-tenths interest and unto said county, its assigns and successors an undivided one-tenth interest in and to said bridge . . . subject to the reservations herein stated . . . for the purposes of establishing and maintaining a free public highway only over the upper deck thereof across the Missouri River,

connecting Kansas City, Missouri, with Clay County, Missouri, for the free passage of wagons, automobiles, vehicles of all kinds, animals and pedestrians,'' which purposes the whole instrument shows were to be accomplished by making the same a part of the State highway system. As we have held, when this instrument became effective. ''the bridge ceased to be a toll bridge'' and immediately ''became a part of the State highway system.'' This was, as we have pointed out, all done pursuant to a statute which authorized the free tender to the State of ''any easement over any privately owned bridge'' acquired with local funds, and which provided that the same should be ''part of the state highways'' and ''be maintained by the State Highway Commission.'' We, therefore, adhere to our ruling that it never became a public street of Kansas City.

Appellant still argues that even though the State routes one of its highways over a city street, the city is not relieved from its duty to maintain it in a safe condition for travel. That argument does not apply to this case because we hold that the upper deck of this bridge never became a street of Kansas City but was changed directly from a private toll bridge to a part of the State highway system. The other points raised in the motion for rehearing were made and argued in appellant's original brief and are ruled by the opinion.

The motion for rehearing is overruled.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.

