S. SIROUNIAN, (PLAINTIFF), RESPONDENT, v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS. A CORPORATION, (DEFENDANT), APPELLANT.—160 S. W. (2d) 451.

St. Louis Court of Appeals. Opinion filed April 7, 1942.

Respondent's Motion for Rehearing Overruled April 21, 1942.

Petition for Writ of Certiorari Denied June 13, 1942.

*Carleton S. Hadley, Walter N. Davis* and *Arnot L. Sheppard* for appellant.

*Charles A. Lich* for respondent.

BENNICK, C.—This is an action to recover for personal injuries and property damage sustained by plaintiff on the night of December 25, 1938, when he was caused to drive his automobile over a curb and against the corner of a tower or permanent brick structure located on the north side of the east approach to the Eads Bridge which spans the Mississippi River between St. Louis, Missouri, and East St. Louis, Illinois, and which, at the time in question, was controlled, managed, and operated as a toll bridge by defendant, Terminal Railroad Association of St. Louis.

Tried to a jury in the Circuit Court of the City of St. Louis, a verdict was returned in favor of plaintiff, and against defendant, in the sum of $1250. Judgment was entered in accordance with the verdict; and defendant's appeal to this court has followed in the usual course.

A concrete bulkhead divides the east approach to the upper or vehicular deck of the bridge, with a driveway constructed to the north of the bulkhead for westbound traffic going upon the bridge proper, and a corresponding driveway to the south of the bulkhead for eastbound traffic leaving the bridge proper. Such bulkhead encloses or guards an open space left between the two traffic lanes of the approach, the purpose of which opening is to permit separation between the train and vehicular decks of the bridge, so that trains may enter upon or leave the train deck located some fourteen to seventeen feet underneath the upper deck or roadway without interfering with vehicular traffic which is required either to climb or to descend the approach to the main span of the bridge, depending upon the direction in which the particular traffic is moving.

At the extreme edge of the bulkhead, where the approach joins on to the main span of the bridge, the two traffic lanes of the approach converge into a single lane or driveway comprising the vehicular deck of the bridge itself, which is considerably narrower than the space occupied by the entire approach with its two traffic lanes separated by the opening left between them for trains entering upon or leaving the train deck of the bridge. The result is that when one driving westwardly passes the end of the bulkhead, he must swerve sharply to his left in order to accommodate his course to the narrower roadway of the bridge itself, while similarly, one driving eastwardly across the bridge is required, upon reaching the bulkhead, to pull over to his right so as to enter upon the south traffic lane which leads down the approach into East St. Louis.

The tower in question, against which plaintiff's automobile crashed, stands on the north side of the east approach at the very point of its juncture with the bridge proper, that is, at the point where the west-

bound traffic lane curves abruptly to the left around the south side of the tower so as to unite with the roadway upon the vehicular deck of the bridge. Though referred to in the evidence as a tower, it is in reality but a small brick building from which steps lead down to the train deck below, and in which defendant's special agents station themselves to watch out for traffic accidents on occasions when vehicular traffic is particularly heavy on the bridge.

Along the north side of the whole length of the approach is a sidewalk some five feet wide, which curves around the tower, and then continues on across the main span of the bridge proper at a width of six and one-half feet. At the inner edge of the sidewalk, and marking the outer limit of the portion of the driveway set apart for vehicular traffic, is a concrete curbing seven inches wide and seven and one-half inches in height by actual measurements.

At the time in question the tower was painted a color which defendant's counsel identified as "box-car red," but which plaintiff described as "the same color as the street," at least on a night such as the night of the accident, when, according to plaintiff's testimony, "it was pretty foggy and smoky, couldn't hardly see the street and building, it is no different." Elsewhere, in referring to the atmospheric conditions prevailing on the bridge, he said there was "a little fog, smoke and fog," and again, that "it wasn't clear altogether; it was smoke and fog; there was a fog at nighttime." In December, 1938, trains burning soft coal were using the bridge at all hours of the day and night; and absent any wind (which plaintiff's evidence would indicate was the situation at the time of his accident, regardless of what the weather reports may have shown for other periods of the day), the smoke from the locomotives would rise in the opening between the two traffic lanes of the east approach and mingle with any fog that might be present to reduce visibility upon the bridge.

As for the question of the illumination of the tower and the curve in the roadway around it, it appears that located at intervals along the two sides of the bridge were a total of forty-five lamps of one thousand watts each, one of which was placed high up on the south side of the tower itself; and that inside the tower, at least according to defendant's evidence upon the question, was a light on a drop cord, which was kept constantly burning through the nighttime, and the light of which was visible through a window constructed in the east side of the building facing the direction from which plaintiff came in entering upon the bridge. However, there was admittedly no reflector button on the east side of the tower at the time of the accident; nor had defendant seen fit to erect any curb signs or other warning signals that might have been reflected by automobile headlights at any place along the approach leading up to the point where the traffic lane curves to the left in joining on to the main roadway of the bridge.

Plaintiff, who resides in St. Louis, had frequently crossed the bridge by street car or bus, but when making use of that mode of transportation had paid no particular attention to his surroundings. In the six months he had owned an automobile, he had driven across the bridge on one or two occasions, but in each instance in the daytime, when there was nothing to lend confusion with respect to the curve in the driveway and the location of the tower.

About ten o'clock on the night in question, plaintiff left a friend's home in East St. Louis to return to his own home across the river, and in due course entered upon the westbound traffic lane on the east approach to the bridge. As we have already indicated, his testimony was that there was smoke and fog to reduce visibility, at least to the point that he "couldn't hardly see the street and building." He admitted the presence of the lights upon the bridge, but as for appreciating the location of and his proximity to the curve, his testimony was, "I don't know that night; I can't see that night."

Plaintiff estimated his speed at twelve or fifteen miles an hour, and stated that as he approached "pretty close" to the curve, the headlight of a westbound locomotive which happened to be entering upon the train deck of the bridge from behind him was reflected in his rear vision mirror so as to blind him from seeing out for the full range of the lights of his automobile. "I maybe can see ten feet," he said, which he later qualified by intimating that he was "about seven feet" from the building when he first saw it, and "so close I couldn't stop." Asked by the court if he stopped when the locomotive headlight struck his mirror, he answered, "No, it was the same time this happened, that happened," by which he obviously meant that the accident occurred so shortly after he was blinded by the headlight as to have left no appreciable period of time between the two occurrences. As it was (and despite his own insistence of moderate speed), he ran his automobile over the seven and one-half inch curb and across the intervening sidewalk, and then crashed into the corner of the tower with such force and violence as to demolish his automobile completely and produce serious injuries to his person, for all of which he seeks to recover damages in this proceeding.

The negligence pleaded and relied upon by plaintiff in the submission of the case was the failure of defendant to have warned plaintiff of the abrupt curve at the end of the east approach, where it converged into and upon the roadway of the vehicular deck of the bridge, and immediately beyond which the tower was located.

Defendant answered by a general denial, coupled with a plea that whatever injuries plaintiff had sustained had been the result of his own negligence directly contributing thereto, in that he had driven his automobile at a high and dangerous rate of speed under the circumstances existing at the time and place of the accident, and had failed to keep a proper lookout and to see the obstruction against which

he ran, when, by the exercise of due care on his part, he could have done so.

As has already been indicated, the trial resulted in a verdict and judgment for plaintiff; and the case is here on defendant's appeal, where it is argued, as a matter of chief insistence, that plaintiff not only failed to make a submissible case upon the theory of defendant's actionable negligence, but also that his own evidence served to convict him of contributory negligence as a matter of law.

The gist of defendant's contention with respect to the issue of its own actionable negligence is that there was no duty on its part to warn plaintiff of the existence of the curve in the roadway, and especially so if the evidence is to be taken as disclosing that he was already fully aware of the existence of the curve and of the location of the tower; that even if it should be assumed that he was entitled to a warning, there was nevertheless ample warning given him by the light on the side of the tower, as well as by the drop light inside the building which was visible through the window; and further, that in any event, under plaintiff's own testimony, the proximate cause of his injury was not the failure to warn him (the ground relied upon as the sole basis for his recovery), but the fact that the rays of the locomotive headlight struck his rear vision mirror and blinded him momentarily before the accident.

While the measure of defendant's duty as the owner and operator of the bridge was only to use ordinary care to keep the bridge in a reasonably safe condition for travel upon it, such ordinary care was none the less care in a degree proportionate to the danger to be apprehended and avoided. [Gibler v. Terminal R. R. Ass'n. of St. Louis, 203 Mo. 208, 101 S. W. 37.]

Indeed, this is always the situation where the question of the exercise of care is concerned, since what is ordinary care in a given instance, that is, such care as an ordinarily prudent person would be expected to exercise under the same or similar circumstances, must depend upon the circumstances and be measured by the exigencies of the particular situation. In other words, ordinary care is not in all cases a fixed legal standard which the court may arbitrarily apply, but on the contrary, it is a relative term depending upon the character of the act or business of the one charged with the duty, and the relation he bears to the person to whom he owes the duty. Such being the case, and the question of what is due care being thus dependent for its determination upon the surrounding facts and circumstances, it obviously follows that the greater is the danger which is known or reasonably to be anticipated, the greater becomes the degree of care to be observed, and the greater the precautions to be taken by way of avoiding resultant injury. [De Bolt v. Kansas City, Ft. S. & M. Ry. Co., 123 Mo. 496, 27 S. W. 575; Riggs v. Metropolitan Street Ry. Co., 216 Mo. 304, 115 S. W. 969; McCleary v. Chicago, B. & Q. R. Co.

944

(Mo.), 264 S. W. 376; Hughes v. Mississippi River & B. T. Ry., 309 Mo. 560, 274 S. W. 703.]

Relying upon the broad principle that the duty of a toll bridge proprietor is identical with that of a municipality in the sense that each is only required to use ordinary care to keep its roadways in a reasonably safe condition for travel upon them, defendant cites a line of decisions which hold that a municipality is not liable for injury sustained by persons who travel outside the designated portions of its streets (as by crossing over a curb and striking an obstruction located off the highway proper), nor for negligence on its part in regulating or failing to regulate traffic, which is a governmental function as to which the doctrine of immunity from liability obtains. Notable among such cases is Carruthers v. City of St. Louis, 341 Mo. 1073, 111 S. W. (2d) 32, wherein the court reviews the former decisions with respect to the liability of a municipality for injuries occurring to members of the traveling public, and reaffirms the doctrine that while a municipal corporation is liable for its torts committed while acting in its ministerial or proprietary capacity (such, for instance, as in the observance of its duty to keep its streets in a reasonably safe condition for the ordinary use to which they are subjected), not so in the case of negligence in the exercise of a function purely governmental in its character, where the municipality, while acting in such capacity, represents the sovereignty of the State.

It is thus apparent that decisions which have to do with the liability of a municipality for injuries upon its streets do not in all events determine the liability of a private operator of a toll bridge for injuries occurring upon his bridge. If the city should maintain a bridge as a part of its system of streets, and the injury should occur from the inherently dangerous mode of construction of the bridge or from some physical imperfection which the city negligently permitted to exist, then of course the city's liability would be identical with that which would obtain if the same bridge were maintained and operated by a private individual. But if the injury should occur, not from some physical imperfection of the bridge, but as the result of negligence in connection with the direction of traffic upon it, while the city would be relieved from liability upon the ground that its dereliction came in the performance of a governmental function, there would be no such excuse in the case of a private operator of the bridge, who could not claim the benefit of a public status with its corresponding immunity from liability in such respect.

Now in the case at bar, even though plaintiff claims no defect whatever in the physical condition of the bridge but counts only upon negligence of defendant in failing to warn him of the curve at the end of the approach where it converged into and upon the main roadway of the bridge, we are not prepared to say that there would be no case for the jury upon the issue of defendant's negligence as

charged, when full effect is given to plaintiff's evidence respecting the hazard to be encountered while crossing the bridge in the nighttime with visibility impaired by fog and smoke. As we view the case, however, the question of defendant's negligence need not be argued as a paramount issue, since in any event plaintiff's own evidence serves to convict him of contributory negligence as a matter of law.

. In determining the issue of plaintiff's contributory negligence, the court is not required to accord probative force to plaintiff's statement that he was going only twelve or fifteen miles an hour, when the physical facts show unmistakably to the contrary. Under his own admission, he ran over a concrete curb seven and one-half inches in height and then crashed into the tower with such force and violence as to leave his car a total wreck, or "junk," as he himself described it, all of which, as a matter of common knowledge regarding the operation of automobiles, disproves his bare statement of moderate speed, and instead conclusively indicates that he was driving at a highly excessive speed, at least if atmospheric conditions on the bridge were such as he represented them to be, and without which there could obviously be no basis for claiming the necessity of a warning of the existence of the curve over and above that afforded by the light upon the bridge.

We are not unaware that as a general proposition of law, a motorist is not in all events and under all circumstances to be held guilty of contributory negligence as a matter of law merely because he drives at such a speed that he cannot stop within the distance that his headlights shine out ahead of him. On the contrary, if there is conflicting evidence on the vital questions touching the plaintiff's negligence, and the attending circumstances are such that reasonable minds might well differ as to whether he was to be excused for driving at such a speed as to make it impossible for him to stop within the range of his headlights, the question of his contributory negligence is properly held to be an issue for determination by the jury. [Roper v. Greenspon, 272 Mo. 288, 198 S. W. 1107; Kendrick v. Kansas City (Mo.), 237 S. W. 1011.]

It is to be noted, however, that cases applying this rule are primarily those where the motorist, having no reason to suspect other than a clear road ahead, finds himself suddenly confronted with an obscured or unlighted obstruction standing in the street or roadway proper. In the case at bar, plaintiff ran into no obstruction in the roadway of the bridge, but on the contrary, ran off the roadway and sustained his injury when he crashed into the tower located to the side of the portion of the bridge set apart for vehicular travel. Moreover, the tower and curve were lighted in the manner which the evidence disclosed; and if the atmospheric conditions were such as to prevent plaintiff from seeing the curve notwithstanding the

light located immediately above it, then we think there can be no room for reasonable difference of opinion about the fact that in driving at the high speed which the physical facts indicate, he was guilty of negligence directly and proximately contributing to his injury. This is not a case where the question of plaintiff's negligence is wrapped up in conflicting and contradictory evidence, but instead, all the evidence material to the issue comes from plaintiff's own side of the case, and convicts him, by his own admissions, of contradictory negligence as a matter of law.

This conclusion eliminates the necessity for any discussion of the question of whether, in the event it could be thought that visibility upon the bridge was so little impaired by smoke and· fog as to have permitted plaintiff to drive at the speed he did without the imputation of negligence on his part, it was not the sudden glare of the locomotive headlight upon his mirror which was responsible for all subsequent events to the point of constituting such circumstance the proximate cause of the accident.

No case having been made for the jury, it follows that the judgment rendered by the circuit court should be reversed; and the Commissioner so recommends.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. The judgment of the circuit court is, accordingly, reversed. *Hughes, P. J.,* and *McCullen* and *Anderson, JJ.,* concur.