Mattie Romaine TREON, widow of Robert
Treon, deceased, Respondent,

v.

CITY OF HAMILTON, Missouri, a Municipal
Corporation, Appellant.

No. 49282.

Supreme Court of Missouri,
Division No. 2.

Jan. 14, 1963.

Don Chapman, Jr., Chapman & Chapman, Chillicothe, for appellant.

Robert C. Frith, Don E. Black, Chillicothe, for respondent.

EAGER, Presiding Judge.

This is a suit for the wrongful death of Robert Treon, who was killed when his automobile ran into a ditch within the city limits of Hamilton, Missouri, on December 7, 1960. In order to understand the nature of the occurrence, we will have to describe the locality in some detail. Missouri Highway 13 had formerly run north and south along Hughes Street in Hamilton from Berry Street (a main east and west street running through the center of town, which was then also U.S. Highway 36) south to the city limits. We are not interested in the highway north of Berry Street. At intersecting streets along Hughes Street there were stop signs, and the State Highway Department maintained the street. In the summer of 1960 that Department relocated and rebuilt a large part of this highway within the city limits; beginning at a point about six or seven blocks south of Berry Street new No. 13 was built to curve northeasterly so as to intersect Berry Street in the center of town,— about two blocks east of its former southbound junction. Thus, at the junction of the old and new Highways 13, there remained a sort of irregular triangle lying between the northeasterly curve of the new road, the north and south remains of the old black top road along Hughes Street, and the new gravel turnoff curving to the east from the old road to the new, the curve being to the left as one traveled south. This change had apparently been completed in the early fall of 1960. As indicated, old No. 13 was of black top construction and it was maintained by the state, with stop signs to protect it, until the changes were effected. At the time of this casualty, and for the purpose of drainage, a ditch 30 feet wide and from 5–8 feet deep had been excavated along the north side of new 13, running generally east and west, and extending across the width of old 13 just where (in its former course) it would otherwise have intersected the new road. This ditch led to a culvert running under the new road. We are not told specifically whether the north and south sides of this ditch were beveled or graded so as to slope, but we may reasonably assume that they were, as otherwise the walls would collapse. Some distance north of this ditch, and just south of where the new gravel turnoff began, a smaller ditch had been excavated across approximately the west half of old 13, it being about eight feet in length; this led to another culvert under the remainder of old 13 and afforded drainage from the west side of the old road. Between these two ditches the old black top remained, for probably 100 feet or more (it appearing that the distance from the large ditch to the new gravel turnoff was 169 feet). From this intervening and remaining black top a driveway led westward into a private residence. Just south of that driveway, and blocking much of what previously was the south bound lane of the old road, there was a long pile or windrow of asphalt, approximately 14 inches to two

feet high and two to two and one-half feet wide. Thus, as one proceeded south on Hughes Street, and if he did not take the new turnoff, his course was impeded by the small ditch, the pile of asphalt, and further on, the large drainage ditch. It seems that words are inadequate to explain clearly this rather complicated physical situation, but enough thus appears to enable one to understand what follows.

This casualty occurred at about 6:45 p. m. on December 7, 1960. Treon lived in Breckenridge, some twelve miles northeast of Hamilton. He and one Junior Clark had left Breckenridge at 6:20 or 6:25 p. m. in Treon's 1955 Ford to see Treon's step-daughter play in a basketball game at Lawson. Their route led through Hamilton and south along No. 13. Except for some casual and immaterial testimony from a woman who sought to identify Treon and Clark as men whom she saw in a car with a girl outside the Tasti Freeze in Hamilton at about 6:30 p. m., no one saw Treon after he left home and prior to his death. The attempted identification just mentioned was unimpressive and, even if true, was wholly immaterial. Treon and Clark were found dead in their car in the southerly part of the large ditch, already described, at about 6:50 p. m. One witness coming southeasterly on new 13 (northeast of the spot) saw a flash of lights and found the car in the ditch; both men had obviously died immediately. There was evidence that the bumper was imbedded in the south wall of the ditch about eighteen inches from the ground level; the back of the car was at the bottom of the ditch. The front of the car was "mashed back" and the car severely damaged. The glass face of the speedometer was broken and a portion of the bottom of a brown bottle was found inside; one or two witnesses described this as part of a beer bottle. The label of a beer bottle and apparently another piece of the glass were found on the floor.

Reverting to the status of this immediate area,—upon construction of new 13, the Highway Department ceased to maintain Hughes Street, and on September 8, 1960, wrote the Mayor of defendant, stating that the old route along Hughes Street was no longer needed, and that it had "relinquished" to the City the old route between certain designated points. The witnesses indicated that this area included all of Hughes Street north from a point 15–20 feet north of the north side of the large ditch. The City was not shown to have taken any formal action thereafter to abandon that part of Hughes Street lying south of the turnoff; physically it remained open except for the obstructions noted, and it was used by vehicular traffic at least for the purpose of entering and leaving the private driveway. There was an ordinary street light on a pole at the east side of Hughes Street approximately at the point where the new turnoff left that street; further south and across the new highway to the east was a filling station with relatively bright lighting. The City of Hamilton had a twenty-five mile an hour speed ordinance. At about the time of the foregoing changes U.S. Highway 36 was also relocated from the center of Hamilton, east and west, to a location running south of Hamilton; that matter, however, is purely incidental here.

It was shown beyond all possible doubt that there were no barricades, warning signs, stop signs, turn signs, traffic lights or other devices facing one as he traveled south on Hughes Street at the time of this occurrence. The only sign was a stop sign considerably to the east as one reached the new highway after driving across the new gravel turnoff. Thus, as one drove south on old 13, he would normally see no signs whatever, and no barricades. We interpose here the suggestion that the City has advanced the idea that the turnoff to the left was perfectly visible, was in itself a sufficient warning, and that it could be seen for at least a block even at night. The City takes the further position that it had had nothing to do with putting the ditches or obstacles there and had no responsibility in the premises, although the Mayor admitted that the City had jurisdiction or control of

the area down to a point 15–20 feet north of the large ditch, and that he knew that people used the area of the old road at least for getting in and out of the private driveway.

Treon's principal occupation was that of a roofer and roofing contractor; it was indicated that he had done some work in Hamilton and was seen there occasionally. It was not shown whether or not he had any knowledge of this particular area or of the road changes, or whether he had traveled the road after the changes were made.

There was a verdict and judgment for the defendant. Plaintiff filed her motion for new trial on three grounds: (1) that the verdict was "against the law and the evidence in this case"; (2) error in giving Defendant's Instruction No. 5; (3) error in giving Defendant's Instruction No. 5A. The court granted plaintiff a new trial; in the original order no ground therefor was stated. Upon motion of plaintiff and by nunc pro tunc order it was thereafter shown that the motion was sustained "on all grounds alleged * * *."

■■ The appellant City insists that a verdict should have been directed for it because no negligence on its part was shown. In considering that point, we look to the evidence most favorable to the plaintiff. Erbes v. Union Electric Co., Mo., 353 S.W. 2d 659. The City's first position is that the Highway Department constructed the ditches without even asking its consent, that the larger (and fatal) ditch became a part of the State Highway System, and that the City could not, in any event, have prevented this action. State ex rel. State Highway Commission v. Elliott, Banc, Mo., 326 S.W. 2d 745. It must be conceded, of course, that the Department had the right to so locate the road and the incidental ditch. That, however, does not automatically relieve the City of all responsibility for areas within its jurisdiction and not absorbed in the highway, such as this area. We refer to this later. Principally, the City insists that, as-

suming a duty to exercise ordinary care to maintain its streets in a reasonably safe condition, the new road (to which it says traffic had been rerouted) was easily visible, and that when deceased left the street proper and entered the area which was not then set aside and used for travel and which had been substantially withdrawn, all responsibility of the City ceased. It cites: Griffin v. City of Chillicothe, 311 Mo. 648, 279 S.W. 84, 42 A.L.R. 1273; Lavinge v. City of Jefferson, Mo.App., 262 S.W.2d 60; Lowery v. City of Kansas City, 337 Mo. 47, 85 S.W.2d 104; Sparks v. City of Kansas City, 236 Mo.App. 710, 160 S.W.2d 819; Sutton v. Fox Missouri Theatre Co., Mo., 336 S.W.2d 85; Gardner v. City of Covington, 86 Ind.App. 229, 156 N.E. 830. Those cases generally involved situations where one had left the traveled portions of a street and ventured into parts which had obviously been reserved or withdrawn from travel, and where the identical conditions had long existed and thus afforded notice to the public. The principle is thus announced that a city may choose what part of a platted or established street it will improve and open to travel, and that it is generally liable for defects only in that portion of the street. In one of the cited cases, Lavinge, supra, the presence of "grass and high weeds" straight ahead at a "T" intersection was said to be a "warning" of the situation. The cases clearly recognize liability for defects and dangers such as excavations so close to the traveled portions of streets as to endanger persons using them in the ordinary manner. Lavinge, Sparks, supra; Miller v. Missouri Wrecking Co., Mo., 187 S.W. 45. The Lowery case merely exempted the city from liability on the ground that the A.S.B. bridge in Kansas City was a part of the State Highway System and was not a city street.

■■ Here most of the area in question had been returned to the City, if indeed it had ever been officially taken by the Highway Department in the first instance. Reference is made in the City's brief to the

date when the City "officially regained control," and when "Hughes Street was thrust upon appellant." A city has a non-delegable duty to maintain its streets in a reasonably safe condition or to warn of dangers and defects. Lowery, supra. This is true even though a contractor may also be liable, or some third person (as a street car or bus company) may have the primary duty to repair. Lowery, supra; Fosmire v. City of Kansas City, Mo., 260 S.W.2d 252; Plater v. W. C. Mullins Construction Co., 223 Mo. App. 650, 17 S.W.2d 658; Young v. City of St. Louis, Mo.App., 178 S.W.2d 641; State ex rel. Kansas City v. Shain, Mo., 177 S.W.2d 511; Crockett v. City of Mexico, 336 Mo. 145, 77 S.W.2d 464. And the fact that the City did not *cause* the defect does not, in itself, relieve it of liability. Lithegner v. City of St. Louis, Mo.App., 125 S.W.2d 925. No case has been found with facts very similar to those in the present case. As analogous, however, we note the ·following: Nicholas v. Kansas City, Mo. App., 171 S.W.2d 744, and State ex rel. Kansas City v. Shain (certiorari on same case) Mo., 177 S.W.2d 511 (city liable for negligent construction or maintenance by W.P.A. on sidewalk construction); Williams v. City of Mexico, 224 Mo.App. 1224, 34 S.W.2d 992 (plaintiff drove off unguarded abutment of old bridge just outside city limits, where *highway and street* had been relocated); Chance v. St. Joseph, 195 Mo.App. 1, 190 S.W. 24 (failure to erect barricade at end of street where appearance was deceptive and there was a dangerous drop-off). In State ex rel. Kansas City v. Shain, supra, where the work had all been done by the W.P.A., this court said, 177 S.W.2d, loc. cit. 512–513: "Here we have an injury to an individual because the city failed to observe its non-delegable duty of exercising ordinary care to maintain its sidewalk in a reasonably safe condition for pedestrians to travel over. Although the ramp was not provided at the direction of the city still the city had notice of it and of its dangerous condition. Even if the city was under no duty to provide the ramp, as

relator contends, yet this will not excuse it from liability for permitting the ramp to remain in a dangerous condition where it is a part of the sidewalk. Relator claims no conflict with respondents' decision that the ramp constituted a part of the sidewalk." The case of Williams v. City of Mexico, 224 Mo.App. 1224, 34 S.W.2d 992, is closely analogous to the present case on the deceptive nature of an unguarded drop-off or precipice existing because of the relocation of a street connecting with a bridge and highway, and the City's liability therefor. It has also been held that when a portion of a street has been withdrawn from public use the intention "must be made unmistakably manifest." Gerber v. Kansas City, 311 Mo. 49, 277 S.W. 562, 565.

■ In view of the highly deceptive nature of the physical situation in this area, including the recent relocation of the highway, the continuance of the black top paving southward except for the ditched areas, the complete failure to barricade or warn in any manner, we conclude that plaintiff made a submissible case of negligence on the City's failure to barricade or warn. In arriving at this conclusion, we say with some reluctance that we have had little assistance from any authorities cited in the brief of plaintiff's counsel.

■ We shall defer consideration of the contention that deceased was contributorily negligent as a matter of law until after considering the assignments of the motion for new trial. The first assignment of the motion that the verdict was "against the law and the evidence" raises nothing and is meaningless. Robbins v. Robbins, Mo., 328 S.W.2d 552, 555, and cases there cited; Edmisten v. Dousette, Mo.App., 334 S.W.2d 746, 750; Bond v. Williams, 279 Mo. 215, 214 S.W. 202, 206, 16 A.L.R. 755; Belcher v. Haddix et ux., Mo.App., 44 S.W.2d 177, 178; Whitehead v. Liberty National Bank, Mo.App., 56 S.W.2d 833, 834; Marsters et al. v. Bray, Mo., 85 S.W.2d 479, 481. Thus, the action of the court in granting a new trial "on all grounds of the motion" may not

be considered here as a ruling that the verdict was against the weight of the evidence.

We proceed to the assignments on supposed errors in instructions. The first of these is that the court erred in giving Defendant's Instruction No. 5 "because there was no evidence of negligence on the part of plaintiff's deceased husband, and such instruction was misleading to the jury and prejudicial to plaintiff." The only argument made is the supposed lack of evidence. That instruction merely told the jury that "negligence," as used in other instructions and as applied to the deceased, meant the failure to exercise the highest degree of care, which in turn meant "such care as would have been exercised ordinarily by a very careful and prudent person under the same or similar circumstances." The charge that there was no submissible evidence of plaintiff's negligence is unfounded; we prefer to treat this specifically in connection with the next assignment. Counsel cite two cases for the wholly obvious proposition that it is error to give an instruction when there is no evidence to support it. The court was in error in sustaining the motion on the second assignment.

The third assignment of the motion was that the court erred in giving Defendant's Instruction No. 5A in that: there was no evidence of decedent's negligence in driving at an excessive speed, in failing to keep his car under control, or in failing to keep a proper lookout; also, in referring to the failure "to observe the turn into new 13" because therein the court assumed that there was such a turn; and because the giving of the instruction permitted speculation and conjecture. That instruction told the jury that the law required the deceased to exercise the highest degree of care (defining it), and that if decedent failed to do so in *one or more* of the following particulars: "(1) By driving at a high and excessive rate of speed under the circumstances. (2) By failing to keep his motor vehicle he was driving under control under the conditions and circumstances then and there existing. (3) By failing to keep a proper

look-out and to observe the turn into new 13 and the conditions of the land south of said turn. And that such failure on his part, if you so find, directly caused or contributed to cause Robert Treon's death, then your verdict must be for the defendant."

■ The trial court, as indicated by its remarks at the time of the hearing on the motion for a new trial, felt that there was no evidence to support any of the assignments of contributory negligence in this instruction. In that the court was clearly mistaken. While the evidence is all circumstantial, the facts which we have already recited established a submissible issue of contributory negligence on excessive speed and the failure to keep a lookout. We deal with the question of control later. Decedent's car did travel approximately 169 feet after leaving the point of the "turn off" and before entering the large ditch; the force of the impact caused very serious damage to the car; both men were apparently killed immediately. These facts, alone, were sufficient to establish a submissible issue on excessive speed, regardless of the city ordinance. The evidence of lighting and of the visibility of the new turnoff in the road was sufficient to establish a submissible issue on the failure to keep a proper lookout. On these issues, however, we merely mean that there was substantial evidence, direct or circumstantial, from which the jury could have found that decedent was negligent in either or both of these respects, and that such negligence directly contributed to his death.

The submission of the issue of a failure to keep the car *"under control"* is a different matter. In the case of Miles v. Gaddy et al., Banc, Mo., 357 S.W.2d 897 (1962), the court held that an instruction submitting a failure "to keep the truck * * * under control under the circumstances * * *" was a submission of general negligence, was confusing, and constituted a roving commission to the jury. The court there said, loc. cit. 900–901: "As applied to the operation of a motor vehicle, loss or lack of control is usually the result of some antecedent act or

omission which is the essential fact that should be hypothesized in the verdict-directing instruction. Myers v. Buchanan, Mo., 333 S.W.2d 18, 21.

"[2] Even though an allegation of general negligence in the pleadings is unchallenged, an instruction must submit the specific acts of negligence shown by the evidence unless the case is one where the doctrine of res ipsa loquitur applies. Annin v. Jackson, 340 Mo. 331, 100 S.W.2d 872, 875[1]; Watts v. Moussette, 337 Mo. 533, 85 S.W.2d 487, 491 [6]; Allen v. Missouri Pac. Ry. Co., Mo., 294 S.W. 80, 87. * * *

"[3] * * * As shown by the numerous cases cited, the submission in these circumstances of failure to control the motor vehicle as a hypothesis of negligence is not a correct statement of either statutory or case law and its inclusion renders the instruction prejudicially erroneous."

▬ The present case was tried before the Miles opinion was handed down; but the decisions in the prior cases there discussed clearly demonstrated the error in giving such an instruction. And, if there is any substantial doubt concerning the propriety of an instruction, we are more inclined to sustain the action of a trial court in refusing the instruction or in granting a new trial because of it, than we are to reverse a case independently because the instruction was given. In view of the long history of criticism and condemnation of the submission of a failure to control, we hold that for this reason, and *this reason alone,* the court here properly granted a new trial, unless decedent was guilty of contributory negligence as a matter of law. We consider that question next.

On that contention defendant cites: Sirounian v. Terminal R. Ass'n of St. Louis, 236 Mo.App. 938, 160 S.W.2d 451; McGrew v. Thompson, 353 Mo. 856, 184 S.W.2d 994; Jackson v. Southwestern Bell Tel. Co., 281 Mo. 358, 219 S.W. 655; Rohmann v. City of Richmond Heights, Mo.App., 135 S.W.2d 378; and Gerhard v. Terminal R.

Ass'n of St. Louis, Mo., 299 S.W.2d 866. The facts and circumstances affecting this particular issue vary so widely in every case that no one case can ordinarily control another. In the last case cited, Gerhard, the decedent had apparently ignored four different types of warnings before he struck the curb of a bridge, skidded, and crashed through the railing on the opposite side. In Rohmann, the plaintiff had full knowledge of the condition of that part of the street upon which construction work was being conducted and upon which he drove, and the injury occurred in daylight. In Jackson, all the conditions complained of were clearly visible and were of long standing, the accident occurred on a country road, and plaintiff was familiar with the road. The facts in Sirounian are somewhat closer to ours; there plaintiff drove into a curb and a small lighted building located on a curve at the end of a bridge approach, and at a time of claimed poor visibility; these obstructions would ordinarily be more visible at night than a ditch; also, there was apparently no evidence of a total absence of warnings in that case, although there were no reflector signs.

▬ Counsel argue here, with some force, that decedent's action in traveling 169 feet to the ditch and imbedding the bumper in the soil 18 inches from the ground level, leaves no inference except that of excessive speed; also, that his failure to see the turn-off, visible from a block away even at night, similarly left no inference except that of a failure to keep a reasonable lookout. These facts, as already indicated, established a substantial fact issue of contributory negligence. We hold that they did not establish it here as a matter of law. In our holding that there was substantial evidence of the City's negligence there inhered the idea of a concealed danger in the present situation; that holding, in itself, essentially rules the present contention. The conditions here were not similar to those of an ordinary and permanent bridge approach, as in Sirounian, supra. The decedent did not live in Hamil-

ton; it was not shown that he knew of the recent road changes; the evidence as to the frequency and extent of his visits to Hamilton were vague. He apparently avoided the first and smaller ditch which extended across the west or south bound lane of Hughes Street (old 13) and the pile of asphalt just beyond it. If, however, he hit any part of either of these, this fact may have had a substantial and disastrous effect upon his course. Aside from that, however, it is most difficult to say, *as a matter of law,* just what an automobile (or its driver) will do, at any speed, when it has entered an *obstacle course* such as this was. So far as the position of the bumper is concerned, we may reasonably assume that the south bank (or both banks) of the large ditch were sloped or graded; thus, it may be that even a moderate impulse plus the continued motor power of the car might have caused it to plow up the bank as described. The grading of the ditch was never discussed in the City's evidence. Counsel have presented, in argument, a rather complicated set of formulae of physics involving the rate of gravitational fall to show that plaintiff was traveling at least 48 miles an hour. We are not at all impressed with their applicability here. We hold that not all reasonable minds would conclude here that the decedent was negligent in the circumstances of this highly unusual and recently created situation. The facts here are somewhat analogous to those in Eidson v. Dean Construction Co., Mo. App., 233 S.W.2d 820, 823; Chance v. St. Joseph, 195 Mo.App. 1, 190 S.W. 24, and Williams v. City of Mexico, 224 Mo.App. 1224, 34 S.W.2d 992, 994. The presence of pieces of a broken beer bottle in the car was certainly not, in itself, sufficient to convict decedent of contributory negligence as a matter of law. Chance, supra.

For the error in Instruction No. 5, as already discussed, we hold that there was no error in granting a new trial. The order granting a new trial is therefore affirmed and the cause remanded for further proceedings.

All of the Judges concur.